In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1367

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GRAYSON ENTERPRISES, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:16-cr-20044-SEM-TSH-2 — **Sue E. Myerscough**, *Judge.*

ARGUED SEPTEMBER 26, 2019 — DECIDED FEBRUARY 12, 2020

Before BAUER, MANION, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Grayson Enterprises, Inc., is a roofing company that does business under the trade name Gire Roofing. A grand jury indicted Grayson alongside its business's namesake, Edwin Gire, on charges of visa fraud, harboring unauthorized aliens, and employing the same aliens.

On paper, though, Gire had no official relation to Grayson as a corporate entity—he was not a stockholder, officer, or

even an employee of the corporation. He managed the roofing (Grayson's sole business), as he had under the Gire Roofing name for more than twenty years. The corporate papers instead identified Grayson's president and sole stockholder as Kimberly Young. Young—Gire's girlfriend—incorporated and acted as president of the "new" company Grayson, after Gire's previous roofing company went bankrupt. Gire, his retained counsel, and the government all nevertheless represented to the district court that Gire was Grayson's president. The district court, thus, permitted Gire to plead guilty on his and Grayson's behalf to three counts of employing unauthorized aliens and to waive his and Grayson's rights to a jury trial on the remaining charges. Joint counsel also represented both defendants during a bench trial that resulted in their convictions on all charges and a finding that Grayson's headquarters was forfeitable to the government because Gire had used the building to harbor aliens.

Despite obtaining separate counsel before sentencing, neither Grayson nor Young (who testified at trial) ever complained to the district court about Gire's or prior counsel's representations. Neither did Grayson object to the indictment, the plea colloquy, or the fact that the court found, without a separate hearing, that Grayson had used its headquarters to facilitate the harboring of unauthorized aliens. Nevertheless, Grayson now challenges all these matters, and more, on appeal. Grayson identifies some areas where this case could have gone more smoothly but no errors that warrant reversal. We therefore affirm the district court's judgment.

## I. Background

### A. Factual Background

Gire began his roofing business in the 1990s and has conducted it under multiple corporate entities, all of which have used the business name "Gire Roofing." In 2011, this name belonged to Gire Construction, Inc., of which Gire was president and owner. On behalf of his corporation, Gire submitted a petition for temporary foreign workers under the H-2B visa program, which allows a limited number of foreign workers to enter the United States "to perform … temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

To show a need for these temporary workers, Gire told the government, under penalty of perjury, that his company had received two massive roofing contracts. No such contracts existed; Gire had made them up and created false documents to support his fabrication. The government did not know this at the time, of course, so it accepted Gire's petition and approved him to receive 93 H-2B workers. These workers obtained their visas, arrived in the United States, but never worked for Gire. He nonetheless applied later that year for an extension and reassignment of 19 workers' visas from another company to Gire Construction. These workers, too, did not work for Gire.

Around the same time, Gire Construction was going through financial difficulties, and Young became involved. She and Gire created two corporations, the first was Grayson, which immediately adopted the name Gire Roofing and stepped into its operations. A month later, Gire filed for

Chapter 7 bankruptcy personally and on behalf of Gire Construction, which he dissolved. Young and Gire represented to creditors that Gire was the general manager of Grayson, responsible for its daily operations. On paper, though, Young owned 100 percent of Grayson, and Gire was neither its officer nor its employee. Grayson also represented to Illinois agencies that it had no employees. Young herself worked a full-time job elsewhere.

Young's second corporation was Quick Leasing, Inc. (Quick being her former surname). By the end of 2011, Quick Leasing acquired five apartments in Villa Grove, Illinois, that had belonged to Gire until shortly before his bankruptcy. At times, Quick Leasing leased these apartments to some of Grayson's workers, and Gire deducted rent—but never taxes or employment insurance—from their paychecks.

Gire applied again to receive H-2B workers using a set of false contracts in 2013. He and Young worked closely with an attorney to prepare this application, and Gire submitted it on behalf of "Grayson Enterprises Incorporated, d/b/a Gire Roofing, care of Edwin Gire" and signed parts of the petition as the "owner" or "president" of Grayson. The government approved Grayson to receive 43 workers. When these workers arrived in Illinois, Young took them to purchase supplies and to obtain Employee Identification Numbers. After doing so, all but one, Cresencio Garcia-Cruz, left to parts unknown. Garcia-Cruz moved into one of the Villa Grove apartments and stayed to work for Grayson and Gire.

According to Young, Gire was frustrated that only one worker stayed and complained to his recruiter, Kevin Daley. Whenever Gire had his petitions approved, it was Daley who was in Mexico finding people for the government to give the

visas (although Gire had said in his 2013 and 2014 petitions that he was not using a recruiter). As a supposed refund for the walkouts, Daley wired $4,000 to Young's personal bank account; he had sent Gire Construction a similar $2,000 payment in 2011. Daley, however, had not been recruiting workers but illegally selling the visas. Garcia-Cruz had purchased his for $3,500.

Around the beginning of 2014, Quick Leasing sold the Villa Grove apartments and used the funds to purchase a warehouse in Champaign, Illinois. It leased the warehouse to Grayson to use as a headquarters. Prior to that, Grayson had a much smaller headquarters, and Gire did most of his office work out of Young's home, where he lived as well.

Gire renovated part of the warehouse into a dormitory, with bedrooms, communal bathrooms, and shared living space. He then asked Garcia-Cruz and another Grayson worker, Rene Lopez-Constantino, to move out of the Villa Grove apartments and into the warehouse. Several more workers (the government estimated twelve) moved in too, including Dario Torres-Hernandez. By this point Garcia-Cruz's visa had expired and he was no longer permitted to stay in the United States. Both Torres-Hernandez and Lopez-Constantino were never authorized to enter the United States. While these three men lived in the warehouse, Gire withheld rent from their pay.

Young soon quit her job to take care of her and Gire's daughter. A few months later, she started working for Grayson, helping with marketing. She received her own office in the warehouse, next to Gire's.

Gire submitted a fourth application for H-2B workers around this time, yet again relying on a series of fake contracts to justify his need for workers. Again, he and Young worked closely with their attorney, and Gire signed the petition as owner and president of Grayson Enterprises d/b/a Gire Roofing. The government approved the application but never issued the visas. Employees at the Mexican consulate had interviewed some of the workers who had received visas in 2011, and they admitted to never working for Gire. This triggered an investigation that uncovered Gire's fraud.

In May 2014, the government executed a search warrant on the warehouse. They discovered the dormitory and identification documents for at least fourteen Grayson workers, many apparently unauthorized to be in the United States. In Young's office, agents found original copies of portions of the 2013 and 2014 applications, the falsified contracts, and letters notifying Grayson that its request for workers had been approved. After the search, Garcia-Cruz, Torres-Hernandez, and Lopez-Constantino moved out of the warehouse. Young helped them find new housing, as they continued to work for Gire. After Garcia-Cruz and Torres-Hernandez stopped working for Gire, they stayed in their apartments and paid the rent themselves (at a lower cost to them).

## B. Procedural Background

Two years later, a grand jury returned a ten-count indictment against Gire and Grayson. The first two counts, for visa fraud, 18 U.S.C. § 1546, related only to Gire and his two fraudulent applications in 2011 on behalf of Gire Construction. The remaining eight counts charged both Gire and Grayson. Counts three and four alleged visa fraud based on the 2013 and 2014 applications, respectively. Counts five through

seven charged Gire and Grayson with harboring aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii); one count each for Garcia-Cruz, Lopez-Constantino, and Torres-Hernandez.

Counts eight through ten charged that Gire and Grayson had "engaged in a practice and pattern of hiring for employment in the United States certain aliens … as specified below, knowing that said aliens were unauthorized aliens (as defined in [8 U.S.C. § 1324a(a)(h)(3)]), with respect to such employment." The indictment then contained the following chart depicting the specific counts in violation of 8 U.S.C. § 1324a(a)(1)(A) and (f)(1):

| COUNT | ALIEN | DATES |
|---|---|---|
| Eight | C.G.-C. | April 2014 to September 2014 |
| Nine | R.L.-C. | April 2012 to September 2014 |
| Ten | D.T.-H. | April 2008 to September 2014 |

Finally, the indictment alleged that the warehouse was forfeitable to the government because it had been "used to facilitate … the commission of the offense." 18 U.S.C. § 982(a)(6)(A)(ii)(II). The forfeiture allegations further disclosed that, if the warehouse had been transferred or sold to a third party, the government would be entitled to seek substitute property. Quick Leasing, though, had already sold the warehouse to another company in 2015, about nine months before the indictment.

Gire told the district court at his initial appearance that he was acting as Grayson's authorized corporate representative. Gire's retained attorney then entered his appearance as counsel for both defendants, and Gire pleaded not guilty to all charges on both his and Grayson's behalf.

Shortly before trial, Gire changed his and Grayson's pleas to guilty for counts eight to ten, the misdemeanor employment counts. A magistrate judge presided over the plea colloquy and issued a report and recommendation regarding the acceptance of the plea. At the colloquy, Gire again stated, this time under oath, that he was acting in both his individual capacity and as the corporate representative for Grayson.

The magistrate judge never inquired into Gire's authority as a representative. He did, however, ask the government and defense counsel whether either had "any doubt as to defendant's competence to enter a plea today for both defendants." Both lawyers said they had none. The government then offered a factual basis that Gire was Grayson's president and that he and Grayson had "knowingly continued to seasonally employ Garcia-Cruz after his visa expired" and had known that both Lopez-Constantino and Torres-Hernandez were not authorized to work in the United States. Gire and counsel agreed with this basis, and Gire pleaded guilty personally and then as Grayson's corporate representative. The magistrate judge recommended that the district court accept the pleas. After the deadline passed to object to the report and recommendation, the district court did so.

On the morning of trial, Gire waived his and Grayson's rights to a jury trial on the remaining counts. Gire again gave sworn testimony that he was authorized to waive Grayson's rights. Counsel likewise confirmed Gire's competence to waive both his and Grayson's rights and submitted a signed waiver including Gire's signatures in both his individual capacity and as authorized representative of Grayson.

The trial lasted six days and Young testified on the defendants' behalf. She explained that she owned Grayson, but Gire

ran its day-to-day affairs. Her input into Grayson's business was "very limited." She "knew nothing of the roofing industry whatsoever" and had no knowledge of the business, customers, or "any of that." Gire, though, worked long hours, seven days a week during the roofing season, as a "one-man operation," conducting sales, ordering materials, talking to customers, and even driving the dump truck.

Nonetheless, Young admitted that she emailed roofing contracts to her and Gire's attorney in 2014 and knew they were false. She also was aware that Gire paid workers in cash, without collecting taxes, but did not know if they were authorized to work in the United States. When pressed, however, she admitted that she knew Garcia-Cruz's visa had expired and that he was in the United States illegally. Prior to that, she said, Garcia-Cruz was the only H-2B visa worker who Gire Roofing had ever legally employed. She also knew that Grayson had pleaded guilty to unlawfully employing Garcia-Cruz after his visa expired.

Gire and Grayson presented a joint defense. On the visa fraud counts, the government introduced a substantial log of emails and messages between Gire, Young, and their immigration attorney regarding Grayson's applications, as well as the paperwork found in Young's office. The defense tried to explain away this evidence by asserting that one of Daley's associates, whom Gire and Young knew only as "Fatima," had prepared the applications. Fatima, in the defense's theory, had forged Gire's signatures and used his and Young's letterhead, computers, and cell phones to create the false contracts and the communications with their lawyer, all for Daley's own aims and without Gire's knowledge.

On the harboring counts, they argued that the warehouse
was not intended to conceal the unauthorized aliens and
therefore could not qualify as "harboring" as defined by 8
U.S.C. § 1324. Instead, Gire and Grayson were providing them
housing only as a favor, or alternatively, as part of an arm's-
length transaction. The defendants' closing argument cen-
tered on the theme that they had pleaded guilty to the one
crime they were guilty of—hiring unauthorized aliens—and
they had hired them only to replace the authorized aliens who
had left because of Daley and Fatima's machinations.

Unconvinced, the district court found Gire and Grayson
guilty of all charges. The court issued a short opinion finding
that there was no credible evidence supporting the defense's
theory that Fatima had produced the false contracts and im-
personated Gire and Young. It concluded that the government
had carried its burden to show visa fraud: Gire had know-
ingly presented false, material statements in his visa applica-
tions. Grayson was vicariously liable for this fraud because
Gire was Grayson's authorized agent, had acted within his
authority as its agent, and did so, at least in part, to benefit
Grayson by obtaining workers for Grayson's business or pay-
ments from Daley.

Regarding the harboring counts, the district court con-
cluded that the government's evidence was sufficient to prove
harboring. The court accepted that Gire and Grayson had not
sought to conceal the three aliens in the warehouse but had
offered housing as a benefit of otherwise underpaid employ-
ment. (The workers testified they worked up to 70 hours a
week and were paid between $6 and $15 an hour with no
overtime adjustments.) The court thought this, plus the fact
that living in Gire-associated properties minimized the

workers' need to interact with other people—especially land-lords that might demand documentation—sufficed to prove that Gire had harbored them in the warehouse. Again, Grayson was vicariously liable for Gire's actions. The court emphasized that Grayson had benefited from paying workers in housing instead of wages, and that Young, Grayson's owner, had known Gire was housing the workers at the warehouse.

The government noted in closing argument that it was seeking forfeiture but said the issue did not need to be addressed "until after the Court enters its verdicts on the charged counts." Thus, neither party discussed forfeiture at length. The district court, however, found in its verdict that the warehouse had been used to facilitate the harboring offense. The court asked the government to tender a proposed preliminary order of forfeiture reflecting this finding.

After the verdict, trial counsel moved to withdraw from representing Gire and Grayson, who planned to obtain new joint counsel. In doing so, he requested an extension of time to file post-trial motions or to request a hearing regarding forfeiture. The district court granted the motion and set a March deadline for either party to request a hearing on the forfeiture issue. In February, new counsel entered his appearance on behalf of both Gire and Grayson and sought a continuance on sentencing, but he did not request a forfeiture hearing before the deadline passed. In May, joint counsel withdrew from his representation of Grayson because he determined that the defendants' interests were not identical for issues of sentencing, restitution, or forfeiture. Grayson retained its own attorney who entered an appearance shortly thereafter. Grayson's counsel also did not request a forfeiture hearing.

The government, for its part, did not follow the district court's directions to file a preliminary order of forfeiture of the warehouse. Instead, it moved for a preliminary order of forfeiture of substitute assets. 18 U.S.C. § 982(b); 21 U.S.C. § 853(p). The government represented that the new owner of the warehouse was likely a bona fide purchaser for value but argued that the sale was "a result of an[] act or omission of the defendant," so it could seek a money judgment against Grayson and satisfy that judgment through substitute assets. 21 U.S.C. § 853(p). The government identified three such assets, two buildings in Florida owned by Quick Leasing and a third in Champaign, owned by Hensley Market LLC (another Young-affiliated entity). The court entered the preliminary order a few days later.

Gire and Grayson then moved separately to vacate the order, arguing that they did not have anything to do with the sale of the warehouse. They both acknowledged the court's finding that there was a nexus between the warehouse and the harboring convictions, but only Gire challenged that finding. Gire did not request a hearing on the nexus issue but did request one on the forfeiture of substitute assets. Both defendants disputed the finding that Grayson owned the warehouse and agreed that Quick Leasing had always owned it.

The government tried to salvage its request by arguing that Quick Leasing was Grayson's nominee. The court saw no factual record to support this theory and vacated the preliminary order without a hearing. In doing so, it reiterated its finding that there was a nexus between the harboring of aliens and the warehouse where the aliens were harbored and concluded that this finding was not undermined by the possibility that Grayson did not own the warehouse. The court recognized

that it was required, based on its verdict, to enter a preliminary order of forfeiture, but again it did not do so.

The government then moved for a general order of forfeiture. *See* Fed. R. Crim. P. 32.2(b)(2)(C). Gire and Grayson opposed this request, and the district court agreed that the government failed to demonstrate that it could not "identify all the specific property subject to forfeiture," as required for a general order. *Id.* This time, the court itself entered a preliminary order of forfeiture of the warehouse.

The next day, at sentencing, the district court entered the same forfeiture as a final judgment. It sentenced Gire to three years' imprisonment and Grayson to three years' probation plus a $250,000 fine. Both defendants' Guidelines sentencing ranges were enhanced because Young had offered materially false testimony in their defense. U.S.S.G. §§ 3C1.1, 8C2.5(e).

Gire and Grayson both appealed. Gire moved to stay the consolidated appeal pending the result of his motion to vacate his conviction, 28 U.S.C. § 2255. We denied the motion to stay, and Gire voluntarily dismissed his appeal. (His § 2255 motion is pending in the district court; he alleges that trial counsel provided ineffective assistance, but his claims are largely irrelevant to the issues in this appeal.)

Only Grayson's appeal remains before us, and it challenges nearly every aspect of this case. First, it contends that the district court erred by allowing trial counsel to represent both it and Gire, despite a perceived conflict between them. Second, it seeks to withdraw its guilty plea on several grounds: Gire lacked authority to plead guilty on its behalf, the indictment was defective, the plea was involuntary, and there was an inadequate factual basis. Third, Grayson renews

its argument that there was insufficient evidence to convict it of harboring and adds that there was not enough evidence to hold it vicariously liable for Gire's crimes. Finally, it insists that the forfeiture of the warehouse was entered in violation of its due process rights. We conclude that none of these purported errors merit reversal and, therefore, affirm the judgment.

## II. Ineffective Assistance of Counsel

Grayson's principal argument on appeal is that the district court failed to explore a conflict of interest between it and Gire before permitting trial counsel to jointly represent them. Rule 44 of the Federal Rules of Criminal Procedure obligates the district court to "promptly inquire about the propriety of joint representation and … personally advise each defendant of the right to the effective assistance of counsel, including separate representation." Fed. R. Crim P. 44(c)(2).

The government rightly concedes error; the district court was required to conduct a Rule 44(c) inquiry, and it failed to do so. But we have held that a failure to follow Rule 44(c) is not itself a reversible error. *United States v. Colonia*, 870 F.2d 1319, 1327 (7th Cir. 1989). That is because "neither the inquiry nor the advice is itself the goal of the rule." *United States v. Bradshaw*, 719 F.2d 907, 915 (7th Cir. 1983) (quoting *United States v. Benavidez*, 664 F.2d 1255, 1258 (5th Cir. 1982)). Rather the rule is "prophylactic," and a defendant seeking reversal must show that he was denied the Sixth Amendment right to effective counsel that the rule was designed to protect. *Benavidez*, 664 F.2d at 1258–59; *see also Colonia*, 870 F.2d at 1327

("Rule 44(c) aims primarily at prevention of actual conflict of interest in the joint representation case.").[1]

There are two alternative paths through which a defendant who did not object to a conflict of interest can demonstrate ineffective assistance of counsel. *Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013); *Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004). The first is to demonstrate that "an actual conflict of interest adversely affected his lawyer's performance" under *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

An adverse effect exists if there is a "reasonable likelihood that … counsel's performance would have been different had there been no conflict of interest." *Hall*, 371 F.3d at 974. The defendant must show "specific instances where [its] attorney could have, and would have, done something different if that attorney had represented only one defendant." *Griffin v. McVicar*, 84 F.3d 880, 887 (7th Cir. 1996) (quoting *United States v. Cirrincione*, 780 F.2d 620, 630–31 (7th Cir. 1985)). Prejudice is presumed if the defendant makes this showing. *Mickens v. Taylor*, 535 U.S. 162, 173 (2002); *Hall*, 371 F.3d at 973.

If the defendant cannot prove there was an actual conflict, then the alternative is to show that a potential conflict of interest led counsel to provide objectively deficient representation that caused prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Blake*, 723 F.3d at 880. Prejudice for *Strickland* purposes means that "there is a reasonable probability

---

[1] The government does not address whether Grayson, as a corporation, has a Sixth Amendment right to effective and conflict-free counsel in the first place. *See United States v. Rad-O-Lite of Phila., Inc.*, 612 F.2d 740, 743 (3d Cir. 1979) (holding corporation has this right). For purposes of this appeal, we assume, without deciding, that it does have such a right.

that but for counsel's unprofessional errors the trial outcome would have been different." *Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011). In other words, a reasonable probability the defendant would have been found not guilty. *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994).

Grayson has not shown that there was an actual conflict between it and Gire. "An *actual* conflict exists when an attorney actively represents incompatible interests; it is more than a 'mere theoretical division of loyalties.'" *United States v. Fuller*, 312 F.3d 287, 291 (7th Cir. 2002) (quoting *Mickens*, 535 U.S. at 171). Gire's and Grayson's interests were not only compatible—they were identical. Gire *was* Grayson in all but the paperwork.

Grayson insists that it was merely "associated independently" with Gire, who was not even its employee, let alone its management. That is absurd and completely unsupported by the record. Grayson admits, even on appeal, that roofing was its "sole enterprise," and there is no evidence that it did any roofing except under Gire's name. (Indeed, Grayson's roofing contractor license was in Gire's name.) Gire was, in Young's words, "a one-man operation" managing all Grayson's roofing work from bidding on contracts to driving the dump truck. He was not doing this as a volunteer. Grayson held Gire out as its manager to the public, and the record reveals no other management. Young herself testified she had nothing to do with Grayson's business, except when she started helping with marketing in 2014. Gire and Grayson were one and the same. Any conflict between them is merely theoretical.

When we asked Grayson at oral argument to identify the conflict, counsel theorized that trial counsel had Young testify

with the hope of saving Gire at Grayson's expense. Calling Young as a defense witness might have proved unsuccessful in hindsight, but it did not reflect a conflict.[2] Young presented a common defense—neither Gire nor Grayson was guilty, Fatima was. A common defense "often gives strength against a common attack." *Holloway v. Arkansas*, 435 U.S. 475, 482–83 (1978). This is true here; if the district court had believed Young's testimony regarding Fatima then it would have acquitted both Gire and Grayson. Likewise, if Gire was not harboring aliens, as a legal matter, then neither was Grayson. Because Gire and Grayson were effectively the same, *any* evidence that might have helped Gire would have also helped Grayson, reflecting the compatibility of their interests.

Grayson notes the reverse is not true. It posits that unconflicted counsel would have tried to pin the whole case on Gire, on the theory that he was not working for Grayson but exploiting it. For there to be an adverse effect under *Sullivan*, however, Grayson must prove that this abandoned defense "presented a plausible alternative to the strategy actually pursued at trial." *Taylor v. Grounds*, 721 F.3d 809, 819 (7th Cir. 2013). Plausible does not mean winning, as the Supreme Court has rejected the application of harmless error in the context of an actual conflict. *Id.*

Despite this low bar, Grayson falls short: its exploitation theory is flatly implausible. No evidence supports a theory that Gire was running a side-hustle out of his office, siphoning money from Grayson without Young's knowledge. His name

---

[2] We express no opinion on whether calling Young as a witness was deficient performance independent of a conflict of interest. Gire has made this claim in his § 2255 motion, but Grayson has not raised it here.

was next to hers on Grayson's bank statements, and whatever income the company had, legitimate or otherwise, Gire had a hand in. He publicly ran Grayson's entire business with Young's blessing and out of her own home at times. The record includes photographs of Gire Roofing trucks and equipment at the warehouse, and statements from employees and competing roofers describing Gire's outsized role in the business. Young deferred to Gire in running the company, asking their immigration lawyer, in an email, "would it be okay for me to sign it since I'm the owner?" In sum, Gire was Grayson. There was no plausible way to demonstrate otherwise, so Grayson cannot show an actual conflict that adversely affected its defense.

Nor can Grayson prove deficient performance or prejudice under *Strickland*. Grayson makes much of the fact that trial counsel never filed a Rule 29 motion for acquittal. The government does not assert any sort of forfeiture of Grayson's rights, though, and instead accepts that Grayson has preserved its arguments about the sufficiency of the evidence. We address these arguments below. Because we conclude they are meritless there is not a "reasonable probability that … the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, had counsel filed a Rule 29 motion.

Grayson otherwise contends that trial counsel's performance was deficient because he allowed it to plead guilty for no benefit. We address this argument in the next section, and conclude that it, too, is meritless, in part because counsel made the strategic decision to plead guilty to the misdemeanor counts to bolster Grayson's credibility on the felony counts. It is difficult, if not impossible, to prove that a strategic choice like this was unreasonable on a bare trial record.

*Massaro v. United States*, 538 U.S. 500, 505 (2003); *United States v. Flores*, 739 F.3d 337, 339–40 (7th Cir. 2014) (recognizing that counsel can sometimes make a reasonable strategic decision to concede issues even over his client's plea of not guilty).

Grayson has not shown that it was deprived of any right to effective assistance of counsel that it may have had.

### III. Guilty Plea

Grayson next asks to withdraw its guilty plea to the three misdemeanor counts of hiring unauthorized aliens as part of a pattern or practice, 8 U.S.C. § 1324a(a)(1)(A), (f)(1). It could have moved in the district court to withdraw its plea at any time before sentencing, which occurred nine months after it obtained separate counsel. Fed. R. Crim. P. 11(d)(2)(B). It never did, though, so we review its arguments now only for plain error. *United States v. Vonn*, 535 U.S. 55, 59 (2002); *United States v. Zacahua*, 940 F.3d 342, 344 (7th Cir. 2019).

To show plain error, a defendant has the burden of meeting four elements. First, it must prove "that an error *actually* occurred, not merely that an error *might* have occurred." *United States v. Williams*, 931 F.3d 570, 573 (7th Cir. 2019). Second, the error must be plain—i.e., clear or obvious—it cannot be "subtle, arcane, debatable, or factually complicated." *United States v. Pierson*, 925 F.3d 913, 922 (7th Cir. 2019) (quoting *United States v. Turner*, 651 F.3d 743, 748 (7th Cir. 2011)). Third, the error must have affected its substantial rights, which requires here that the defendant "show a reasonable probability that, but for the error, he would not have entered the plea." *Zacahua*, 940 F.3d at 345 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004)). If those three conditions are met, we may correct the error, if, in our discretion,

we conclude it would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1905 (2018). Though Grayson identifies numerous potential errors, none satisfies these four requirements.

## A. Gire's Authority to Plead Guilty

Grayson primarily contends that the district court erred in accepting its guilty plea from Gire. The magistrate judge who conducted the colloquy never inquired into the basis for Gire's authority to plead guilty on behalf of Grayson. The judge asked only whether Gire, who was under oath, was there as a representative of the corporation. Gire confirmed that he was. The magistrate judge might understandably have been complacent, having a man named Gire pleading guilty on behalf of a company that the case caption listed as Grayson Enterprises d/b/a Gire Roofing. The government also complicated things when it represented in its factual basis that Gire was Grayson's president, a point to which both Gire and defense counsel agreed.

The magistrate judge should have engaged in a more searching inquiry to confirm Gire's authority to plead guilty on behalf of Grayson. The Federal Judicial Center's Benchbook for District Court Judges recommends that a corporate representative's authority to plead guilty be the first thing the judge confirms during a plea colloquy for an organizational defendant. Fed. Judicial Ctr., Benchbook for U.S. District Court Judges § 2.02 at 75 (6th ed. 2013), https://www.fjc.gov/sites/default/files/2014/Benchbook-US-District-Judges-6TH-FJC-MAR-2013.pdf. It suggests more than confirming the defendant's presence as a representative

and advises the court to verify even that a board of directors has passed a valid resolution permitting the plea. *Id.*

Of course, there is no reason to believe that Grayson had a board of directors that failed to authorize the plea. (And in any event, the Benchbook is only useful guidance, not binding law. *See, e.g.*, *United States v. Egwaoje*, 335 F.3d 579, 585 (7th Cir. 2003).) Rather, Grayson listed only Young as its nominal president and sole officer. Grayson insinuates but does not outright argue that she was the only one who could have pleaded guilty on Grayson's behalf. Consistent with this mere insinuation, it cites no authority for the proposition that only a president or other officer can plead guilty on behalf of a corporation.

Gire's lack of a title does not alone mean that he was not duly authorized to plead guilty for Grayson. We may consider the entire record when reviewing for plain error, *Vonn*, 535 U.S. at 74, and what we see establishes that Gire was empowered to plead guilty on Grayson's behalf. Young's trial testimony reveals that Gire had effectively unlimited authority as Grayson's de facto manager. He regularly entered contracts on Grayson's behalf with minimal oversight. (Young would sign some contracts, but she never read them because she knew nothing about roofing.) At the colloquy itself, Gire and defense counsel both asserted to the court that Gire had authority to represent Grayson. Grayson never objected to these assertions, either in response to the magistrate judge's recommendation or after obtaining separate counsel (and after Young testified under oath she was aware of the plea). If it had other evidence to imply that Gire was exceeding his authority, then it could have produced it at that point. It did not do so, and that is enough to resolve this argument for our purposes.

On plain-error review, it is Grayson's burden to prove that an error actually occurred, it cannot rest on the mere possibility one did. *Williams*, 931 F.3d at 573.

Grayson insists that it was not present at the plea colloquy, but even were that true, it would not be an error. The Federal Rules of Criminal Procedure provide that an organizational defendant need not be present if represented by counsel who is present. Fed. R. Crim. P. 43(b)(1). Grayson was represented at the colloquy by counsel. That key fact distinguishes this case from *United States v. Cocivera*, 104 F.3d 566 (3d Cir. 1996), on which Grayson relies. There, a 50% owner of six corporations was tried alongside the corporations but elected at the last minute to proceed pro se. *Id.* at 569. The Third Circuit was concerned about a conflict and thought there was no evidence that the partial owner had unilateral authority to fire counsel, but it did not reach these issues because there was a bigger problem: corporations can appear in court only through a lawyer. *Id.* at 573; *see also Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02 (1993). Even if the owner had authority to fire counsel, he could not then represent the corporations in counsel's stead. Here, it is uncontested that Grayson was represented by it and Gire's joint counsel.

## B. Indictment

Next, Grayson argues that its plea was invalid as it was based on a defective indictment. Because it did not object in the district court, "the indictment 'is immune from attack unless it is so obviously defective as not to charge the offense by any reasonable construction.'" *United States v. Franklin*, 547 F.3d 726, 730 (7th Cir. 2008) (quoting *United States v. Smith*, 223 F.3d 554, 571 (7th Cir. 2000)).

Grayson pleaded guilty to three counts under 8 U.S.C. § 1324a(f)(1), which provides that

> [a]ny person or entity which engages in a pattern or practice of violations of subsection (a)(1)(A) or (a)(2) shall be fined not more than $3,000 for each unauthorized alien with respect to whom such a violation occurs, imprisoned for not more than six months for the entire pattern or practice, or both ….

Section 1324a(a)(1)(A), in turn, states "[i]t is unlawful for a person or other entity … to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien."

Grayson's first objection is jurisdictional: it contends that the indictment did not even charge a crime at all. In its view, hiring an unauthorized alien is merely a civil wrong subject to civil remedies under 8 U.S.C. § 1324a(e)(4). But the indictment was not based on subsection (e)(4). Instead, it charged Grayson with a practice and pattern of hiring unauthorized aliens under § 1324a(f)(1), entitled "[c]riminal penalty." The indictment thus alleged an "offense[] against the law of the United States," as required for the district court to have subject-matter jurisdiction. 18 U.S.C. § 3231. The mere existence of parallel civil remedies does not deprive the court of jurisdiction over an alleged criminal offense.

Grayson next asserts that the indictment fails to state an offense. According to Grayson, the indictment relies on an assumption that hiring a single alien is a pattern or practice, and Grayson was therefore guilty of three such patterns or practices. Even if true, this does not invalidate the plea. To the contrary, by pleading guilty, Grayson waived its opportunity to

seek dismissal of the indictment for failure to state an offense. *See United States v. Wheeler*, 857 F.3d 742, 744 (7th Cir. 2017) (citing Fed. R. Crim. P. 12(b)(3)(B)(v)), *cert. denied*, 138 S. Ct. 640 (2018). Regardless, Grayson's reading of the indictment is nonsense. It charged Grayson with engaging in "*a* practice and pattern," in the singular, and used that phrase one time. The government likewise stated at the plea colloquy that it could prove Grayson engaged "in *a* pattern or practice." At no point did anyone contend that Grayson was guilty of three patterns or practices, only three counts of hiring aliens that combined to one practice. Grayson cannot demonstrate plain error by putting words in the government's mouth.

Taking the opposite tack, Grayson raises a multiplicity argument: the indictment charges a single crime—the pattern or practice—in three counts. It has waived this argument as well. Federal Rule of Criminal Procedure 12(b)(3)(B)(ii) requires that a defendant raise a multiplicity objection by a pretrial motion. Failure to do so, or to explain why there was good cause for that failure, means we "do not conduct even plain error review." *United States v. Lockett*, 859 F.3d 425, 428 (7th Cir. 2017).

Even if we were to review the record for plain error, it is not clear or obvious that the indictment was defective. Grayson insists that the pattern or practice is a single crime that must be charged in a single count, but cites no authority holding as much. Nor have we found any. In resolving a multiplicity objection, we look to the statute to determine "what the allowable 'unit' of prosecution is—the minimum amount of activity for which criminal liability attaches." *United States v. Corrigan*, 912 F.3d 422, 428 (7th Cir. 2019) (quoting *United States v. Ajayi*, 808 F.3d 1113, 1123 (7th Cir. 2015)).

Grayson and the government each offer interpretations of what that unit is here. Grayson argues that a person can be imprisoned for six months "for the entire pattern or practice," and that only that single pattern or practice can be a crime and, hence, a unit of prosecution. 8 U.S.C. § 1324a(f)(1). The government instead emphasizes that the $3,000 fine (the only penalty Grayson faced) is assessed "for each unauthorized alien," implying the unit is the hiring of an alien. *Id.* Each party dismisses the other's reading as a sentencing provision. We do not need to decide who is right. Both interpretations are plausible, so Grayson loses. To prove a plain error, its reading must not only be the better one, it must be "clearly ('plainly') correct." *Lockett*, 859 F.3d at 429.

**C. Voluntariness**

Grayson next challenges its plea as involuntary. It first contends that it was not told what qualifies as a "pattern or practice." The government stated at the plea colloquy that it would have needed to prove that the defendants "engaged in a pattern or practice of … hiring aliens for unlawful employment" but left that phrase undefined. Perhaps it could have clarified that "pattern or practice" means "regular, repeated, and intentional activities, but does not include isolated, sporadic, or accidental acts." 8 C.F.R. § 274a.1(k).

Assuming this omission was an obvious error, the regulatory definition is hardly technical, and the record reveals no reason to believe that Grayson's hiring of unauthorized aliens was isolated, sporadic, or accidental. All Grayson offers is that it hired each alien at different times, but it does not explain how this is incompatible with the regulatory or any definition of "pattern or practice." Grayson has not established that there is a reasonable probability it would not have pleaded

guilty had the court told it the regulatory definition. *Dominguez Benitez*, 542 U.S. at 83; *Franklin*, 547 F.3d at 732.

Grayson insists also that its plea was involuntary because it received no benefit from the plea and was prejudiced by the fact that it had effectively admitted three of the elements of the harboring counts. In addition to the pattern or practice element, the plea colloquy included admissions that Grayson hired the persons named in the indictment, those persons were aliens, and that it knew they were unauthorized to undertake employment. The harboring counts required the government to prove at trial that Grayson harbored the persons named, they were unauthorized aliens, and Grayson knew or recklessly disregarded that they were not lawfully in the United States.

Given the substantial overlap between these elements, the government argued at trial that the guilty plea was "fairly conclusive evidence" that Gire knew that the aliens were not lawfully in the United States, and harboring was thus the only element in dispute. Since Grayson, as a corporation, did not face imprisonment for these counts, it argues that the court should have stopped it from conceding part of the government's case for what it sees as no gain.

Again, even if we assume this was an error, Grayson has not shown an effect on its substantial rights. The government did not rely only on the plea at trial; it introduced evidence that Gire and Grayson knew or recklessly disregarded the fact that Garcia-Cruz, Torres-Hernandez, and Lopez-Constantino were in the country illegally. All three men testified that they either believed Gire knew they were unauthorized or that he never asked, and each said he paid them under the table. The district court, likewise, did not rest its findings on the plea and

found that the undisputed evidence at trial proved Gire and Grayson's knowledge beyond a reasonable doubt. Grayson's guilty plea conceded the obvious, and its closing argument at trial shows that it did so to bolster its defense to the other counts. That this strategy failed is not enough, by itself, to demonstrate plain error. *See United States v. Austin*, 907 F.3d 995, 1000 (7th Cir. 2018) (finding no plain error when defendant pleaded guilty and received no sentencing benefits).

**D. Factual Basis**

Grayson finishes off its challenges to its guilty plea by contesting the factual basis for count eight—its hiring of Garcia-Cruz as an unauthorized alien. The government explained at the plea colloquy that Garcia-Cruz received an H-2B visa based on Grayson's 2013 petition and that his visa expired in November 2013. From this, Grayson infers that it could not have illegally hired Garcia-Cruz, only illegally continued to employ him after hiring. That is a different crime. *Compare* 8 U.S.C. § 1324a(a)(1)(A), *with id.* § 1324a(a)(2). *But see id.* § 1324a(f)(1) (treating both subsections identically). The government contests this reading of the colloquy. It specified that Grayson had "knowingly continued to *seasonally* employ Garcia-Cruz after his visa expired," so it suggests that Grayson rehired Garcia-Cruz based on the roofing season, which runs from the end of March to November.

The government should have made its theory clearer at the plea colloquy. Still, the entire record supports its explanation, which is enough to defeat Grayson's challenge. *See Vonn*, 535 U.S. at 74; *United States v. Arenal*, 500 F.3d 634, 638–39 (7th Cir. 2007). The indictment alleged that Grayson hired Garcia-Cruz in April 2014, after his visa had expired and consistent with

the beginning of a new roofing season.[3] Garcia-Cruz also explained at trial that he did welding work for Gire over the winter, instead of roofing. This testimony supports that he remained a Grayson employee (he said that he "continued" to work for Gire) but it also supports that Gire hired him personally after letting him go as a Grayson employee. This distinction is too subtle to be a plain error. A defendant cannot sit silent before the district court and wait for appeal to quibble with the factual details underlying its plea. Indeed, "[i]t is precisely this type of sandbagging that the heightened standard of plain error review is well-served to prevent." *Arenal*, 500 F.3d at 639.

We conclude that Grayson has not demonstrated that the district court plainly erred in accepting the guilty plea.

### IV. Sufficiency of the Evidence

Grayson next challenges the sufficiency of the evidence. Its first argument is the only one raised on appeal that was also raised in the district court—it contends that there was no evidence that it harbored the aliens. Grayson also argues that the government failed to prove that it was vicariously liable for Gire's crimes.

---

[3] In contrast, the indictment alleged that Grayson and Gire hired the other two aliens in 2008 and 2012, because they were never here legally. Grayson noted for the first time at oral argument that the indictment charged it with hiring Torres-Hernandez before its incorporation in 2011. Even if not waived, we do not think this argument rises to the level of plain error; the government specified that Gire seasonally employed Torres-Hernandez, too. We can also reasonably construe the indictment to allege that Gire hired him in 2008 and Grayson stepped into that employment relationship when it took over the Gire Roofing name and business.

"In considering a challenge to the sufficiency of the evidence, we examine the evidence 'in the light most favorable to the government, drawing all reasonable inferences in the government's favor.'" *United States v. George*, 900 F.3d 405, 409 (7th Cir. 2018) (quoting *United States v. Patel*, 778 F.3d 607, 619 (7th Cir. 2015)). We will affirm the conviction "unless, after thus viewing the evidence in favor of the government, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.*; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We have described this burden as "nearly insurmountable." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir.), *cert. denied sub nom. Sykes v. United States*, 139 S. Ct. 260 (2018), *and cert. denied*, 139 S. Ct. 388 (2018). Grayson has not surmounted it.

## A. Harboring

8 U.S.C. § 1324(a)(1)(A)(iii) provides criminal sanctions for

> [a]ny person who … knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

The statute does not define what it means to harbor an alien, but we have understood the word to "plug[] a possible loophole left open by merely forbidding concealing and shielding from detection." *United States v. Costello*, 666 F.3d 1040, 1045 (7th Cir. 2012).

To explain, we offered a hypothetical: the owner of a restaurant employs known unauthorized aliens, pays them low

wages, and provides them housing to make their underpaid employment attractive and because they lack documentation.

> The owner is harboring these illegal aliens in the sense of taking strong measures to keep them here. Yet there may be no effort at concealment or shielding from detection …. It is nonetheless harboring in an appropriate sense because the illegal status of the alien is inseparable from the decision to provide housing—it is a decision to provide a refuge for an illegal alien *because* he's an illegal alien.

*Id.* The defendant in *Costello* merely allowed her unauthorized-alien boyfriend to live with her, so she was not "harboring" within the meaning of the statute. *Id.*

We applied this hypothetical in *United States v. McClellan*, 794 F.3d 743 (7th Cir. 2015). McClellan ran a restaurant that had several unauthorized alien employees who lived rent-free in a house he owned across the street. *Id.* at 746–47. He was convicted of harboring aliens in the house and argued on appeal that the evidence was insufficient to convict because the employees' alien statuses were not "the driving purpose for the provision of shelter." *Id.* at 750. We rejected this argument because there was "evidence that providing the illegal workers with housing and utilities enabled the workers to avoid detection by authorities and enabled Mr. McClellan to continue to employ them at low wages, keep up his profit margins, and lessen his employment tax burdens." *Id.* From this, we concluded, a jury could infer that McClellan "intended to safeguard his employees from the authorities." *Id.* at 751.

This case appears materially indistinguishable from *McClellan*. The district court agreed and cited *McClellan* in

concluding there was enough evidence to infer that "[b]y giving the aliens a place to live, Gire safeguarded the aliens from the authorities by making it more difficult for the authorities to locate them." Despite this obvious overlap, the district court's reliance on the case, and the parties' thorough discussion of it in the district court proceedings, Grayson's briefs do not even cite *McClellan*. When we asked Grayson how it could distinguish it at oral argument, counsel responded that McClellan's actions were more egregious because he was "hiding the people in the back" of the restaurant. To the contrary, McClellan harbored aliens in a house across the street; it was Grayson that kept them inside its warehouse.

Grayson primarily separates itself from the hypothetical in *Costello* (and by extension *McClellan*) on the grounds that it did not underpay its workers. It concedes that it paid less than the "prevailing wage" that the Department of Labor provides for H-2B visa purposes but counters that it paid over the minimum wage and in accordance with the market for roofing laborers.

Underpayment is not an element of § 1324. Our reasoning in *Costello* and *McClellan* did not depend on a precise determination whether unauthorized alien employees were paid less than any given wage—prevailing, market, or otherwise. We used the fact that the employees were given housing and paid a relatively low wage to infer that the offer of housing was "a decision to provide a refuge for an illegal alien *because* he's an illegal alien." *Costello*, 666 F.3d at 1045. Regardless of how much Grayson paid its workers, it still employed them for less than it could authorized aliens or United States citizens because it never paid employment taxes or insurance on the three aliens' behalf. *McClellan*, 794 F.3d at 750. That benefit

to Grayson suffices to connect the offer of housing to the fact that they were unauthorized aliens and distinguishes Grayson from a defendant that merely houses a person who it knows happens to be an unauthorized alien.

Similarly, the district court's finding that Grayson harbored the aliens is not inconsistent with the fact that Gire overcharged the aliens rent for their rooms. Grayson insists this is evidence of a financial transaction as opposed to harboring, but we view the evidence in the light most favorable to the government, not to Grayson. *See George*, 900 F.3d at 409. In that light, we do not see an arm's-length housing arrangement, but rather Gire's double-dipping on his exploitation of the aliens he was harboring. Again, though we noted the offer of free housing in the *Costello* hypothetical and in *McClellan*, that does not make the lack of rent an element of the offense. It just strengthens the inference of an intent to safeguard aliens because they are unauthorized.

As we said in *McClellan*, the key question for a harboring case under § 1324(a)(1)(A)(iii), divorced of hypotheticals and factual specifics, is whether there is "evidence from which a jury could conclude, beyond a reasonable doubt, that the defendant intended to safeguard th[e] alien from the authorities." 794 F.3d at 751. One can infer that intent through evidence of underpayment or free housing, *id.*, but that is not the only evidence the government can use to prove it.

The district court could rationally infer an intent to safeguard here from the simple fact that Grayson housed known unauthorized alien employees inside its warehouse. This location, even more than the house across the street in *McClellan*, "minimized the illegal employees' exposure to the general public … and prevented them from engaging in other

commercial transactions, which may have exposed their illegal status." *Id.* In minimizing these risks, Grayson harbored aliens "in the sense of taking strong measures to keep them here." *Costello*, 666 F.3d at 1045. Garcia-Cruz and Lopez-Constantino even testified that Gire asked them to move into the warehouse from their prior apartments once he and Young stopped owning those apartments (perhaps risking a different landlord inquiring into their statuses).

Though Gire also permitted at least one *authorized* alien worker to move into the warehouse, that worker testified that Gire said he could not remain there long "because [the warehouse] was not a place for residency to stay, it was a place to work." The district court could reasonably infer from this testimony that "the illegal status of the alien [was] inseparable from the decision to provide housing." *Id.* at 1045.[4]

It is difficult to imagine a factual scenario any further away from the concerns we had in *Costello* about the government using § 1324 to reach a doctor in an emergency room, a child hosting a sleepover, a family of unauthorized aliens living in their own home, or Costello herself, cohabitating with her

---

[4] In *McClellan*, we rejected an argument that housing authorized aliens alongside unauthorized ones defeats a charge under § 1324. 794 F.3d at 751 n.19 ("The fact that Mr. McClellan was not harboring other aliens, however, does not diminish the evidence that, with respect to illegal aliens employed … the provision of housing and utilities close to the workplace significantly diminished the likelihood that they would be discovered and concomitantly benefitted Mr. McClellan's business endeavors."). Grayson did not raise an argument along these lines in its briefs, though it did in the district court and at oral argument. Even if not waived, this argument fails for the reasons we gave in *McClellan*.

boyfriend. *Id.* at 1044, 1047. We have instead here, like our restaurant hypothetical, "a perfect case of harboring." *Id.* at 1049.

## B. Respondeat Superior

Grayson next challenges the district court's finding that it was vicariously liable for Gire's actions on a respondeat superior theory. To prove Grayson's liability, the government needed to prove beyond a reasonable doubt that (1) an offense was committed by Grayson's agent, (2) in committing the offense, the agent intended, at least in part, to benefit Grayson, and (3) the agent acted within his authority. *See United States v. Oceanic Illsabe Ltd.*, 889 F.3d 178, 195 (4th Cir. 2018); *United States v. One Parcel of Land Located at 7326 Highway 45 N.*, 965 F.2d 311, 316 (7th Cir. 1992); Seventh Circuit Pattern Criminal Jury Instruction 5.03 (2018).

We have already explained that sufficient evidence supported Gire's conviction for harboring, and Grayson does not dispute Gire's conviction for visa fraud. Though Grayson tries to distance itself from Gire, it does not go so far as to argue that Gire was not within the scope of his role as "de facto manager" when he petitioned for and harbored Grayson employees. The evidence more than supports that he was. Young testified she was aware Gire sought H-2B workers in 2013 and all but one had left, petitioned for workers again in 2014, used false contracts to do so, and housed employees in the warehouse. Even without that testimony, the communications between Gire, Young, and their lawyer show her awareness of and acquiescence in Gire's seeking H-2B workers, and all three aliens testified as to her knowledge of their living arrangements. The only disputed element is whether Gire acted to benefit Grayson.

Grayson contends that all the evidence showed benefit only to Gire, not Grayson: Gire collected the rent from the workers directly, and he received the wire transfers from Daley. Except that last part is not even true. Young received the $4,000 wire transfer from Daley based on the 2013 visa fraud (the only successful petition for which Grayson was convicted). Grayson does not grapple at all with this inconsistency, but simply insists that a benefit to Gire is not a benefit to Grayson and that Gire was exploiting the company. We explained above why this theory is not only dubious but implausible. Nevertheless, we can assume for the sake of argument that Gire and Grayson are separate. There was still sufficient evidence that Gire committed these crimes *at least in part* to benefit Grayson.

As that italicized phrase makes clear, not all the benefits of the crime need to go to a corporation for it to be held criminally liable for its agents' actions. "Corporate liability can also arise 'if the employee or agent has acted for his own benefit as well as that of his employer.'" *Oceanic Illsabe*, 889 F.3d at 195 (quoting *United States v. Singh*, 518 F.3d 236, 250 (4th Cir. 2008)). As the district court explained, "Gire requested the H-2B visa workers for Grayson Enterprises." Regardless of what Gire gained from his fraud, Grayson benefited by obtaining at least one employee—Garcia-Cruz. Grayson paid Garcia-Cruz without withholding employment taxes, and Gire harbored him in the warehouse to protect this arrangement, increasing Grayson's profits. *McClellan*, 794 F.3d at 750. We can infer similar intent to benefit Grayson for the 2014 visa fraud; the only reason we cannot point to a concrete benefit is because Gire was caught. Viewed in the light most favorable to the government, this evidence is sufficient to hold Grayson vicariously liable for Gire's crimes.

## V. Forfeiture

Finally, Grayson argues that the district court's forfeiture order deprived it of property (the warehouse) without due process of law, or, alternatively, was improperly entered because Grayson never owned the warehouse.

"The core of due process is the right of notice and the opportunity to be heard." *United States v. Segal*, 432 F.3d 767, 776 (7th Cir. 2005). Grayson here had both. The government and district court notified Grayson that the warehouse was subject to forfeiture before the court entered the preliminary order. The indictment included the necessary forfeiture notice. Fed. R. Crim. P. 32.2(a). The district court also found in its verdict that there was a nexus between the harboring offense and the warehouse, which had been used to facilitate the harboring. It then reiterated this finding when it vacated the order forfeiting substitute assets.

Grayson contends this was not enough notice, because the government never moved for a preliminary order of forfeiture of the warehouse. The alternative motions seeking substitute assets or general forfeiture, it insists, waived the government's right to seek forfeiture of the warehouse itself.

We do not see how the government's actions undermine the notice Grayson had that its rights to the warehouse (whatever they may be) were at risk of being forfeited. Rather than showing an "intentional relinquishment or abandonment," as required for us to find waiver, *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)), these motions demonstrate that the government wanted to seek forfeiture of the warehouse but believed (rightly or wrongly) that it would not be able to enforce such

an order without obtaining additional relief. The indictment asserted the government's alternative right to seek substitute assets if it concluded that the warehouse had been transferred. The government did not waive one right by seeking to enforce the other.

In any event, the government did not need to move to enforce its right to forfeiture of the warehouse. The district court had already found that the warehouse was subject to forfeiture, so there was nothing more to do. All the court needed at that point was to "promptly enter a preliminary order of forfeiture," Fed. R. Crim. P. 32.2(b)(2)(A). It could have done so without asking for a proposed order from the government. The government should have tendered that preliminary order to the district court shortly after the verdict, as the court requested. The government could have then moved to modify that order to seek substitute assets or general forfeiture. Fed. R. Crim. P. 32.2(e). What happened here was more complicated, but we see no practical difference that would rise to the level of a due process violation.

Grayson also had an opportunity to be heard: the six-day trial that led to the nexus finding in the verdict. The Federal Rules of Criminal Procedure allow a district court to make a forfeiture determination based on evidence already in the court's record, Fed. R. Crim. P. 32.2(b)(1)(B). Grayson provides no reason to believe this approach was improper here. We have already concluded that there was enough evidence to prove beyond a reasonable doubt that Grayson harbored aliens in the warehouse. Forfeiture required finding—by only a preponderance of the evidence, *United States v. Smith*, 770 F.3d 628, 637 (7th Cir. 2014)—a nexus between the warehouse and the harboring and that the warehouse was "used to

facilitate" or was "intended to be used to facilitate," the harboring, 18 U.S.C. § 982(a)(6)(A)(ii).

Grayson maintains it was entitled to a separate hearing on forfeiture because the government promised one in its closing argument at trial. This promise did not bind the district court, which, in any event, offered Grayson an extension of time to seek an evidentiary hearing after the verdict and its nexus finding. *See* Fed. R. Crim. P. 32.2(b)(1)(B) (requiring separate hearing "on either party's request"). Grayson never requested one, though. It says in its reply brief that "the defense expressly invoked its hearing rights" but points only to papers in which *Gire* requested a hearing through *his* counsel. Grayson cannot treat its interests as identical to Gire's only when convenient for it (and only after the point when it told the district court that they were different). In any event, Gire's request related not to the nexus determination, but to the forfeiture of substitute assets. Gire and Grayson were not prejudiced when the court vacated that order. In fact, they received the relief they requested.

Finally, the district court rightly recognized that the possibility Grayson might not own the warehouse was not a reason to withhold a forfeiture order. The Federal Rules of Criminal Procedure require the district court to enter a preliminary order of forfeiture "without regard to any third-party's interest in the property." Fed. R. Crim. P. 32.2(b)(2)(A). Likewise, the substantive forfeiture provision applicable here, 18 U.S.C. § 982(a)(6)(A)(ii)(II), permits forfeiture of "any" property "that is used to facilitate … the commission of the offense of which the person is convicted." This language encompasses assets held in the name of third parties, but the initial nexus determination addresses only whether the property subject to

forfeiture is related to the defendants' criminal activities. A third party's interest is not implicated in this initial nexus determination. *See United States v. Grossman*, 501 F.3d 846, 849 (7th Cir. 2007) (interpreting 21 U.S.C. § 853(c), applicable here through 18 U.S.C. § 982(b)(1)); *see also De Almeida v. United States*, 459 F.3d 377, 381 (2d Cir. 2006) ("[C]riminal forfeiture is not a measure restricted to property owned by the criminal defendant ….").

A third party can, however, raise an interest in the property in an ancillary proceeding. 21 U.S.C. § 853(n). Specifically, Federal Rule of Criminal Procedure 32.2(c) allows third parties to file petitions asserting their interests in property to be forfeited. A final judgment of forfeiture for Grayson or Gire does not adjudicate any third parties' rights to the warehouse until the ancillary proceeding is completed. Fed. R. Crim. P. 32.2(b)(4)(A). Here, the judgment itself states only that "the defendant shall forfeit the defendant's interest." If Grayson has no interest, then it has not forfeited a thing, but whatever interest it has, it has forfeited. Perhaps the district court will find that a third party has a stronger claim to the warehouse than the government; regardless, the forfeiture gives the government a better claim than Grayson.

## VI. Conclusion

Although Grayson identifies numerous potential errors in the proceedings leading to its conviction, it has not convinced us that any is cause for reversal. The judgment of the district court is, therefore,

AFFIRMED.