In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2449

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL B. MCCLELLAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:12-cr-00153-PPS-PRC-1 — **Philip P. Simon**, *Chief Judge.*

ARGUED FEBRUARY 13, 2015 — DECIDED JULY 21, 2015

Before WOOD, *Chief Judge*, and BAUER and RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. After a jury trial, Michael McClellan was found guilty of one count of harboring an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii); three counts of mail fraud, in violation of 18 U.S.C. § 1341; and one count of engaging in a monetary transaction involving criminally derived property, in violation of 18 U.S.C. § 1957. Because we believe that the evidence presented to the jury was a suffi-

cient basis on which to rest its verdicts, and because we believe that the jury instructions on the harboring count did not constitute plain error, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Mr. McClellan and his wife, Tina, operated T & M Daycare ("T & M") in Calumet City, Illinois. Nearly all of the families at T & M participated in an Illinois state child-care initiative, which reimbursed daycare centers for care provided to children of eligible families. In order to qualify, the child's parent or guardian had to reside in Illinois, be employed or attend school, and have an income below a specified amount.

Fransis Lopez was hired at T & M in February 2006. At first she had limited contact with Mr. McClellan and Tina. Later, the McClellans promoted Lopez to director; to do so, they had to falsify records to make it appear that she met qualifications dictated by state regulations. Once she became director, she had frequent contact with Mr. McClellan and Tina, both in person and over the phone.

Mr. McClellan and Tina instructed Lopez that, when new families came to the daycare for services, Lopez should falsify applications so that T & M could receive reimbursements from the State. There were also times when the McClellans told Lopez to leave the applications blank so that they could write in the necessary information to obtain reimbursement.

Many of the children who attended T & M also qualified for meals through a state "Healthy Start" program.[1] T & M received reimbursement from the State of Illinois when a qualifying child was provided a meal. Sabrina Sanchez, a former director of T & M, testified that she would record accurately the children in attendance who had eaten meals. She witnessed Mr. McClellan change those numbers on the sheets, which he then submitted to the State for reimbursement. She also noticed that the Healthy Start records contained names of children who did not attend the daycare. When she raised the issue with the McClellans, she was told that the children were on the list because "they may come [to the daycare]."[2] After Lopez took over as director, she would record that children had eaten a meal, when in fact they had not; she did so at the McClellans' instruction.

Testimony from several mothers established that their application forms for T & M had been altered to contain false information, that T & M had sought reimbursement from the State beyond the time their children attended T & M, or that T & M had sought reimbursement from the State when, in fact, their children never actually had enrolled in the daycare.

**B.**

In 2008, Mr. McClellan purchased The Paragon restaurant in Schererville, Indiana. Unbeknownst to Mr. McClel-

---

[1] R.87 at 149.

[2] *Id.* at 243.

lan, the Department of Homeland Security ("DHS") had been investigating The Paragon and its former owners, Louis and Chris Gerodemos, based on information that illegal aliens were working there and living in a house across the street on St. John Road. As part of its investigation, the DHS arrested The Paragon manager Horacio Bastida. Bastida agreed to provide assistance to the Government by recording conversations with Mr. McClellan and also by providing the DHS with documentary evidence that Mr. McClellan was paying part of his employees' wages in cash and was not reporting those wages to the State of Indiana.

In 2008, Mr. McClellan and Tina also signed a purchase agreement for the St. John Road house. When the closing took place, the bulk of the purchase amount was wired from T & M's account. Several members of The Paragon's undocumented kitchen staff lived in the house rent-free. Mr. McClellan paid the utilities for the house and also provided food to these employees.

On July 2, 2009, Bastida recorded a conversation with Mr. McClellan in which he raised the issue of the illegal status of "the guys in the back" of the restaurant.[3] During the conversation, Mr. McClellan stated that he had not been aware of Bastida's illegal status, but he did "kn[o]w about the other guys."[4]

A subsequent recording on August 12, 2009, captured a meeting between Mr. McClellan and his kitchen staff. Mr. McClellan believed that the employees in the back of the

---

[3] Gov't's Ex. 32, Clip A at 2.

[4] *Id.* at 8.

restaurant should be doing a better job because they were receiving free rent, utilities, and food.[5] A conversation between Mr. McClellan and Bastida that same day revealed that Mr. McClellan was told that "the guys in back" had "fake" social security numbers, that Mr. McClellan told Bastida that it was "fine" for those employees to use their fake numbers, and that Mr. McClellan did not want "the guys in the back to punch in no longer" using the electronic system because "a record is produced" and he did not want a paper trail.[6]

On March 24, 2010, law enforcement agents executed a search warrant at The Paragon, the McClellans' residence, and the house on St. John Road. There were eight employees in the restaurant that were working without legal status; four other individuals without legal status were found in the St. John Road house.

## C.

A grand jury returned a five-count indictment against Mr. McClellan: Count 1 charged Mr. McClellan with harboring five illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), based on his employment of those aliens and his providing them with housing at the St. John Road house; Counts 2 through 4 charged Mr. McClellan with mail fraud, in violation of 18 U.S.C. § 1341, based on his submis-

---

[5] *See id.*, Clip B1 at 6 ("I'm giving free food, I'm giving a house to stay, I'm paying light/gas bill … .").

[6] *Id.*, Clip B2 at 3–4.

sion of fraudulent quarterly employment tax reports from October 2009, January 2010, and April 2010; and Count 5 charged Mr. McClellan and Tina with engaging in a monetary transaction involving criminally derived property, in violation of 18 U.S.C. § 1957, based on the transfer of funds from the T & M account for the purchase of the St. John Road house.

The case was tried before a jury, which was given the following instruction with respect to the elements of Count 1:

> Count 1 of the indictment charges the Defendant Michael McClellan with harboring an alien. In order for you to find the Defendant guilty of this charge, the Government must prove each of the following elements beyond a reasonable doubt:
>
> 1. The Defendant harbored the persons named in the indictment.
> 2. The persons named in the indictment were aliens.
> 3. The persons named in the indictment remained in the United States in violation of the law.
> 4. The Defendant knew that the persons named in the indictment were not lawfully in the United States.[7]

Mr. McClellan did not interpose any objection to this instruction. The jury returned a guilty verdict on all five counts,

---

[7] R.90 at 89.

and the court subsequently sentenced Mr. McClellan to a term of fifty-one months on each of the five counts, to be served concurrently. Mr. McClellan timely appealed.[8]

## II

## DISCUSSION

On appeal, Mr. McClellan contends that there was insufficient evidence to convict him on any of the counts of the indictment and that the district court instructed the jury improperly with respect to Count 1. We turn first to the question of the sufficiency of the evidence.

### A.

Mr. McClellan first submits that the evidence was insufficient to convict him of any of the counts of the indictment. When a defendant challenges the sufficiency of the evidence, we will reverse only where, viewing the evidence in the light most favorable to the verdict, the record demonstrates that no reasonable jury could have found all the elements of the crime charged beyond a reasonable doubt. *See, e.g., United States v. Vaughn*, 585 F.3d 1024, 1028 (7th Cir. 2009).

---

[8] The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over Mr. McClellan's appeal pursuant to 28 U.S.C. § 1291.

**1.**

With respect to Count 1 of the indictment for harboring under § 1324(a)(1)(A)(iii), Mr. McClellan first submits that "the government did not prove that [he] knew that any one of the listed and alleged illegal aliens in Count One were, in fact, illegal aliens or, with respect to the property at 1747 St. John St., a resident there."[9] The record establishes, however, that Francisco Jacobo-Ortiz, one of the aliens whom Mr. McClellan was accused of harboring in Count 1, worked in the kitchen at The Paragon for three years.[10] Moreover, in the recorded conversations between Mr. McClellan and Bastida, Mr. McClellan acknowledged on several occasions that he knew that the employees "in the back" of the restaurant, i.e., the kitchen area as opposed to the dining room, were illegal.[11] Indeed, in one recorded conversation with Bastida, Mr. McClellan stated that he had been unaware of Bastida's lack of documentation, but he "knew about the other guys."[12] Finally, Bastida testified that Jacobo-Ortiz was one of the employees present at the meeting with Mr. McClellan in which Mr. McClellan voiced frustration with the employees in the back of the restaurant because, he believed, they should be working harder in light of the fact that they were receiving free rent, utilities, and food.[13] From this evidence,

---

[9] Appellant's Br. 17.

[10] R.89 at 48.

[11] Gov't's Ex. 32, Clip A at 2, 8.

[12] *Id.* at 8.

[13] *See id.*, Clip B1 at 6 ("I'm giving free food, I'm giving a house to stay, I'm paying light/gas bill … .").

therefore, a reasonable jury could conclude beyond a reasonable doubt that Mr. McClellan both knew of the illegal status of Jacobo-Ortiz and knew that he was living at the St. John Road house rent-free.

Mr. McClellan also argues that our recent decision in *United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012), clarified "that the keystone of harboring is concealing the alien from detection by Government authorities."[14] He maintains that *Costello* "reject[ed] the premise that 'harboring' can be equated to 'simple sheltering in the sense of just providing a place to stay.'"[15] He submits that, because he did not take "any actions for the purpose of shielding the illegal aliens from law enforcement detection,"[16] his conviction under § 1324 cannot stand.

In *Costello*, the defendant was romantically involved with a man whom she knew to be an illegal alien, and, at some point in their relationship, he moved in with the defendant. The Government posited that the defendant had "harbored" the alien simply because she had provided him housing. We, however, rejected the idea that harboring included "letting your boyfriend live with you." *Costello*, 666 F.3d at 1043. In striving to define harboring, we observed that "'harboring,' as the word is actually used has a connotation … of deliberately safeguarding members of a specified group from the authorities, whether through concealment, movement to a safe location, or physical protection." *Id.* at 1044. We also

---

[14] Appellant's Br. 16.

[15] *Id.* (quoting *United States v. Costello*, 666 F.3d 1040, 1050 (7th Cir. 2012)).

[16] *Id.* at 17.

noted that "[t]he prohibition of concealing, shielding from detection, and harboring … grew out of the prohibition of smuggling aliens into the United States." *Id.* at 1045. Harboring, we continued, should be seen as "plug[ging] a possible loophole left open by merely forbidding concealing and shielding from detection." *Id.* We gave the following example:

> Suppose the owner of a Chinese restaurant in New York's or San Francisco's Chinatown employs known illegal aliens as cooks, waiters, and busboys because they are cheap labor, and provides them with housing in order to make the employment, poorly paid though it is, more attractive, and also because they lack documentation that other landlords would require of would-be renters. The owner is harboring these illegal aliens in the sense of taking strong measures to keep them here. Yet there may be no effort at concealment or shielding from detection, simply because the immigration authorities, having very limited investigative resources, may have no interest in rooting out illegal aliens in Chinese restaurants in Chinatowns. It is nonetheless harboring in an appropriate sense because the illegal status of the alien is inseparable from the decision to provide housing—it is a decision to provide a refuge for an illegal alien *because* he's an illegal alien.

*Id.* (emphasis in original). In short, we explained that, by housing his illegal employees, "[t]he restaurant owner in our

example provides an inducement to illegal aliens." *Id.* at 1046. We then concluded that a defendant is guilty of harboring for purposes of § 1324 by "providing … a known illegal alien a secure haven, a refuge, a place to stay in which the authorities are unlikely to be seeking him." *Id.* at 1050.

Here, unlike the defendant in *Costello*, Mr. McClellan and his employees were not "cohabiting," nor was he simply providing aliens with a place to stay. Instead, Mr. McClellan's situation mirrors that of the restaurant scenario in *Costello*. The recorded conversations reveal that Mr. McClellan knew that "the guys in the back" did not have legal status, that he instructed them not to punch in in the same manner as other employees, and that he provided them with housing to help compensate them for the otherwise low wages that he was paying them.[17] Therefore, as in *Costello*, he was "harboring these illegal aliens in the sense of taking strong measures to keep them here." *Id.* at 1045.

According to Mr. McClellan, however, *Costello* does not merely require a showing that the defendant's actions had the effect of shielding the aliens from detection; instead, he contends that "*Costello* established that the individual's alien status must be the driving purpose for the provision of shelter such that there also exists the intent by the defendant to help the alien avoid detection by the authorities."[18]

Mr. McClellan's argument mirrors the argument raised by the defendant in another recent § 1324 case, *United States v. Campbell*, 770 F.3d 556 (7th Cir. 2014), *cert. denied*, 135 S. Ct.

---

[17] *See supra* at 4–5.

[18] Reply Br. 4.

1724 (2015). In *Campbell*, the defendant had recruited young women, who had overstayed their visas, into his "Family" of prostitutes and provided them with housing. *Id.* at 561. Following his § 1324 convictions, he appealed and argued that *Costello* established a requirement that "the individual's alien status must be the driving purpose for the provision of shelter such that there also exists the intent by the defendant to help the alien avoid detection by the authorities." *Id.* at 569 (internal quotation marks omitted). Campbell maintained that the district court had erred therefore by "failing to instruct the jury regarding this intent element." *Id.* at 570.

On plain error review, we affirmed Campbell's conviction. We determined that we did not have to resolve the issue of intent because

> [e]ven if Campbell [were] correct that the Government must establish that he provided [the young women] shelter for the purpose of evading detection by law enforcement or immigration authorities, … any instructional error in this regard did not affect Campbell's substantial rights. Although preventing detection by law enforcement was not Campbell's sole purpose for providing [the young women] with housing and employment, and for concealing their identities and whereabouts, the evidence amply showed such prevention was an integral part of Campbell's overall "Family" plan.

*Id.* (footnote omitted).

Although the facts here are not as egregious as those in *Campbell*, here, as in *Campbell*, there is evidence that provid-

ing the illegal workers with housing and utilities enabled the workers to avoid detection by authorities and enabled Mr. McClellan to continue to employ them at low wages, keep up his profit margins, and lessen his employment tax burdens. This connection, as we pointed out in *Costello*, is the key to distinguishing § 1324 harboring from simply providing housing to a known alien: harboring "connot[es] … deliberately safeguarding members of a specified group from the authorities, whether through concealment, movement to a safe location, or physical protection." 666 F.3d at 1044; *cf. United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) (stating that harboring under § 1324 requires an "inten[tion] to help prevent the detection of the alien by the authorities"). Therefore, if our statement in *Costello* were not sufficiently clear, we hold that, when the basis for the defendant's conviction under § 1324(a)(1)(A)(iii) is providing housing to a known illegal alien, there must be evidence from which a jury could conclude, beyond a reasonable doubt, that the defendant intended to safeguard that alien from the authorities. Such intent can be established by showing that the defendant has taken actions to conceal an alien by moving the alien to a hidden location or providing physical protection to the alien. *See Costello*, 666 F.3d at 1044.[19]

---

[19] Mr. McClellan also argues that his case is distinguishable from *Costello* and *United States v. Campbell*, 770 F.3d 556 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1724 (2015), because, in addition to discovering illegal aliens employed at The Paragon in the St. John Road house, authorities also discovered other residents, some of whom were in the country illegally, and others who had legal status. *See* R.89 at 209–10. The fact that Mr. McClellan was not harboring other aliens, however, does not diminish the evi-

(continued…)

Here, the record supports the jury's conclusion that Mr. McClellan intended to safeguard his employees from the authorities. Like the defendant in *Campbell*, keeping his employees' legal status "off the radar" was important to the profitable running of his business, The Paragon. Indeed, the contract for the sale of the St. John Road house was negotiated during the same time period as the purchase of The Paragon.[20] The location of the home minimized the illegal employees' exposure to the general public, and the free rent and utilities both made their lower wages more attractive and prevented them from engaging in other commercial transactions, which may have exposed their illegal status. There was deliberate action on Mr. McClellan's part that made detection of the employees living at the St. John Road house more difficult. Consequently, the elements of harboring under § 1324(a)(1)(A)(iii) are satisfied.

**2.**

Mr. McClellan next argues that there was insufficient evidence to convict him of mail fraud under 18 U.S.C. § 1341 (Counts 2 through 4) because the Government did not establish that, in submitting the false quarterly employment tax

---

(…continued)

dence that, with respect to illegal aliens employed at The Paragon, the provision of housing and utilities close to the workplace significantly diminished the likelihood that they would be discovered and concomitantly benefitted Mr. McClellan's business endeavors.

[20] *See* Gov't's Ex. 37.

statements, he intended to defraud the State of Indiana.[21] "A mail fraud conviction requires three elements: (1) a scheme or artifice to defraud, (2) the use of the mailing system for the purpose of executing the scheme, and (3) the defendant's participation in the scheme with the intent to defraud." *United States v. Giovenco*, 773 F.3d 866, 869 (7th Cir. 2014). Intent to defraud is evidenced by "a 'willful act … with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.'" *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006) (quoting *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)). Intent to defraud "may be established by circumstantial evidence." *United States v. Stephens*, 421 F.3d 503, 509 (7th Cir. 2005) (internal quotation marks omitted).

Mr. McClellan argues that, because the practice of paying illegal workers in cash was established by the former owners of The Paragon, he was merely an unwitting participant in any illegality: "The only connection between [Mr. McClellan's] alleged actions and any loss [to the State] was that he

---

[21] 18 U.S.C. § 1341 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, … shall be fined under this title or imprisoned not more than 20 years, or both … .

trusted dishonest individuals to operate his business. The record does not establish a fraudulent scheme to defraud anyone of anything."[22] This is not the case. Bastida testified that, at Mr. McClellan's direction, he would pay the "back of the house" employees in "cash, and some others half and half, half check and half cash."[23] Mr. McClellan also instructed him to set aside cash tickets and to bring them into Mr. McClellan's office at night.[24] The cash from those tickets would be used to pay the employees. Far from being duped by dishonest prior owners, therefore, Mr. McClellan had full knowledge of how his employees were being paid and that their wages, or at least part of them, were not being reported for tax purposes.

In his reply, Mr. McClellan maintains that he installed a new computer system that kept track of cash withdrawals from the register, and, therefore, there is no evidence of fraudulent intent to hide those transactions from the State.[25] Bastida testified, however, that the cash transactions were not recorded in the same method as other transactions, but were recorded in "Mike's training mode."[26] The fact that cash transactions were being tracked differently than other transactions indicates that Mr. McClellan wanted to know how much cash was coming out of the register, but does not

[22] Appellant's Br. 20.

[23] R.89 at 28.

[24] *See id.* at 33–34.

[25] It is not clear from the referenced testimony when during Mr. McClellan's ownership this occurred.

[26] *Id.* at 203.

suggest he intended to be forthcoming with the State as to those transactions. Indeed, nothing in the record indicates that he was using those records to ensure that he was providing accurate information to the State or calculating accurate withholdings for tax purposes.[27]

**3.**

Lastly, Mr. McClellan challenges his conviction for money laundering under 18 U.S.C. § 1957. Section 1957 of Title 18 provides that "[w]hoever … knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished … ." In the indictment, the Government alleged that Mr. McClellan fraudulently had submitted reimbursement forms to the State of Illinois on behalf of T & M, that T & M in fact had been reimbursed for over $200,000 of services that were nev-

---

[27] Mr. McClellan also cites *United States v. Knox*, 624 F.3d 865 (7th Cir. 2010), for the proposition that Mr. McClellan had to "personally author[]" false or fraudulent documents in order to be guilty of fraud. Appellant's Br. 20. Because he relied on other employees "to run the daily operations of the Paragon," he contends, he cannot be guilty of fraud. *Id.*

*Knox* simply does not speak to the situation here. In *Knox*, the defendant pleaded guilty to the crimes charged, and the defendant's argument on appeal was limited to alleged errors in the application of the Sentencing Guidelines. We therefore did not have an occasion to discuss the evidentiary requirements for the underlying crimes. Moreover, even if *Knox* established such a requirement, here there was ample evidence of Mr. McClellan's involvement in the day-to-day operations of The Paragon.

er provided, and that Mr. McClellan used those funds to purchase the St. John Road house.

Mr. McClellan's sole argument on this count is that there was not sufficient evidence to establish that he intended to defraud the State of Illinois. Instead, he pins the entire fraudulent scheme on Lopez. According to Mr. McClellan, he "delegated the authority of the day-to-day operations of the daycare to Fransis [Lopez]. Fransis was the one who assisted the mothers with filling out the applications and would falsify the attendance and meal records."[28]

Mr. McClellan's arguments, however, ignore Lopez's testimony that she was acting at Mr. McClellan's and Tina's instruction in leaving portions of applications blank and increasing the "Healthy Start" meal tallies. It also ignores Sanchez's testimony that Mr. McClellan would increase the number of meals allegedly consumed by children on the reimbursement claims submitted to the State of Illinois.

Mr. McClellan, at bottom, asks us to ignore Lopez's testimony establishing his fraudulent intent. We will set aside a jury's credibility determination, however, only if the testimony was "exceedingly improbable," meaning that it was "internally inconsistent or implausible on its face." *United States v. Johnson*, 729 F.3d 710, 715 (7th Cir. 2013) (internal quotation marks omitted). Mr. McClellan does not argue that Lopez's testimony falls into either of these categories, and, consequently, we will not disturb the jury's verdict on Count 5.

---

[28] Appellant's Br. 21.

**B.**

Mr. McClellan also maintains that it was reversible error for the district court to fail to instruct the jury "that it needed to assess whether [he] provided shelter to the illegal aliens named in the Indictment for the specific purpose of shielding them from government detection."[29]

Generally speaking,

> [w]e review jury instructions de novo to determine whether, taken as a whole, they correctly and completely informed the jury of the applicable law. We defer to the district court's phrasing of an instruction that accurately states the law; however, we shall reverse when the instructions misstate the law or fail to convey the relevant legal principles in full and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant.

*Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007) (citations omitted) (internal quotation marks omitted).

Here, however, Mr. McClellan failed to object at trial to the instruction of which he now complains and, consequently, has forfeited the objection. *United States v. Wiley*, 475 F.3d 908, 917 (7th Cir. 2007). We review forfeited objections to jury instructions for plain error only. *See id.* "In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights."

---

[29] Appellant's Br. 14.

*Campbell*, 770 F.3d at 558 (quoting *United States v. Aslan*, 644 F.3d 526, 540 (7th Cir. 2011)). Even after a defendant has made these showings, however, the decision to correct an error "is left within the discretion of the court of appeals, and we 'should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Here, we cannot conclude that the district court committed plain error in instructing the jury. An individual violates 8 U.S.C. § 1324(a)(1)(A)(iii) if he "conceals, harbors or shields from detection … [an] alien in any place," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." The district court instructed the jury that the Government must prove beyond a reasonable doubt that:

> 1. The Defendant harbored the persons named in the indictment.
> 2. The persons named in the indictment were aliens.
> 3. The persons named in the indictment remained in the United States in violation of the law.
> 4. The Defendant knew that the persons named in the indictment were not lawfully in the United States.[30]

The instruction, therefore, mirrors the statutory language. Moreover, contrary to Mr. McClellan's assertion, the district

---

[30] R.90 at 89.

court did not leave the jury asea with respect to the defini-
tion of "harbor[]."[31] Critically, the district court instructed
the jury that "[t]o harbor an alien means to provide a known
alien with a secure haven, a refuge, or a place to stay where
it is unlikely that the authorities will be seeking him."[32] This
instruction restates, almost to the letter, the definition of
harboring that we set forth in *Costello*, 666 F.3d at 1050 (de-
fining "harboring" as "providing … a known illegal alien a
secure haven, a refuge, a place to stay in which the authori-
ties are unlikely to be seeking him").

Mr. McClellan nevertheless argues that the instructions
"failed to properly advise the jury that it needed to assess
whether [he] provided shelter to the illegal aliens named in
the Indictment for the specific purpose of shielding them
from government detection."[33] According to Mr. McClellan,
"[t]his Court has previously noted that a district court com-
mits reversible error by failing to instruct a jury on the spe-
cific intent requirement of the harboring statute when doing
so may have changed the outcome at trial."[34] He relies on *Yu
Tian Li v. United States*, 648 F.3d 524 (7th Cir. 2011), in sup-
port of this contention.

In *Li*, trial counsel had proposed a jury instruction "mod-
eled after one used in the Eleventh Circuit," which did not

---

[31] Appellant's Br. 14 (arguing that the district court did not "clarify is-
sues" or "educate the jury" with respect to the meaning of "harboring"
(internal quotation marks omitted)).

[32] R.90 at 90.

[33] Appellant's Br. 14.

[34] *Id.* at 13.

contain specific intent language, because "*there was no controlling case law nor pattern jury instruction for alien-harboring in the Seventh Circuit*." 648 F.3d at 528 (emphasis added). After his conviction for harboring an illegal alien for the purpose of commercial advantage or private financial gain, Li filed a motion under 28 U.S.C. § 2255, in which he maintained that his counsel had been ineffective for, among other reasons, failing to request "a specific intent instruction." *Li*, 648 F.3d at 529. The district court denied relief, and we affirmed. We stated:

> Under the *Strickland* standard, we certainly cannot say that it was outside the realm of reasonable professional assistance for Li's counsel to propose a jury instruction similar to that used by the Eleventh Circuit and reflecting the general intent requirement in several other circuits, *where there was no controlling law in this Circuit*.

*Id.* at 528 (emphasis added). We did note that "there is room to argue that Li's counsel should have requested a specific intent instruction" based on case law from the Ninth Circuit. *Id.* at 529 (citing *United States v. You*, 382 F.3d 958, 966 (9th Cir. 2004)). Nevertheless, we concluded that, even if it were error for Li's counsel not to ask for a different instruction, Li had not demonstrated that the proposed instruction adversely affected his defense because "the evidence clearly indicated that Li's covert acts were taken with a purposeful attempt to violate the law." *Id.* at 530.

Nothing in our analysis in *Li* establishes that a specific intent instruction is required for violations of § 1324(a)(1)(A)(iii), much less that the failure to give such an

instruction was plain error. Indeed, we noted on more than one occasion in *Li* that there was no law from this circuit holding that § 1324 incorporates a specific intent requirement and, relatedly, no circuit law requiring a specific intent instruction. We also observed that counsel's general intent instruction was consistent with the approach of several other circuits. *Li*, 648 F.3d at 528–29 (citing, among other authorities, *United States v. Khanani*, 502 F.3d 1281, 1287, 1289 (11th Cir. 2007), in which the court concluded that a § 1324(a)(1)(A)(iii) instruction, similar in all material respects to the one given here, "correctly addressed all elements of the offenses"). On plain error review, we cannot grant relief "unless the error is clear under current law." *Olano*, 507 U.S. at 734. Because the "operative legal question"—whether § 1324(a)(1)(A)(iii) contains a specific intent requirement—was "unsettled," the district court did not commit plain error. *United States v. Gamez*, 577 F.3d 394, 400 (2d Cir. 2009) (per curiam) (internal quotation marks omitted).

Here, the jury was instructed on the elements of the offense. That instruction required the jury to find beyond a reasonable doubt that the defendant knew the persons whom he was harboring were not lawfully within the United States. The jury was further instructed that "[t]o harbor an alien means to provide a known alien with a secure haven, a refuge, or a place to stay where it is unlikely that the authorities will be seeking him."[35] These instructions, together, told the jury that, in order to convict, it had to find that Mr. McClellan knew the individuals for whom he was providing lodging were illegal aliens and that he provided

---

[35] R.90 at 90.

the housing at least in part for the purpose of keeping their presence unknown to the authorities—to allow them to live "under the radar." The jury was therefore properly oriented as to its task, and Mr. McClellan suffered no injustice from having the case submitted under these instructions.

## Conclusion

The evidence at trial was sufficient to find Mr. McClellan guilty of the charged offenses beyond a reasonable doubt. Additionally, the district court did not commit plain error in instructing the jury on the elements of harboring under 8 U.S.C. § 1324(a)(1)(A)(iii). His convictions therefore are affirmed.

AFFIRMED