RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0257p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee*,

    *v.*

YUN ZHENG aka Wendy Zheng; YAN QIU WU aka
Jason Wu,

      *Defendants-Appellants*.

> No. 22-5516

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:21-cr-00051—David L. Bunning, District Judge.

Argued: October 18, 2023

Decided and Filed: November 28, 2023

Before: CLAY, KETHLEDGE, and MATHIS, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:** Riddhi Dasgupta, TAFT STETTINIUS & HOLLISTER LLP, Washington, D.C., for Appellant. Javier A. Sinha, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert K. McBride, TAFT STETTINIUS & HOLLISTER LLP, Covington, Kentucky, Sarah C. Larcade, MCKINNEY & NAMEI CO., LPA, Cincinnati, Ohio, for Appellants. Javier A. Sinha, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Kyle M. Winslow, UNITED STATES ATTORNEY'S OFFICE, Ft. Mitchell, Kentucky, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

      MATHIS, J., delivered the opinion of the court in which CLAY, J., joined. KETHLEDGE, J. (pg. 15), delivered a separate opinion concurring in part and in the judgment.

———————————————

**OPINION**

———————————————

MATHIS, Circuit Judge.  A jury convicted Yun Zheng and Yan Qiu Wu on four counts of harboring illegal noncitizens for commercial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(A)(v)(II).[1]    Zheng and Wu now appeal, challenging the district court's jury instructions.  Specifically, they argue that the district court: (1) erred in instructing the jury on the meaning of "harboring" by not including a requirement that Zheng and Wu had acted intentionally and knowingly in shielding the illegal noncitizens from law enforcement; and (2) invaded the province of the jury by giving examples of "harboring" in the jury instructions. Finding no error, we affirm.

**I.**

Zheng and Wu owned and operated Tokyo Dragon Buffet, Inc., a Chinese restaurant in Alexandria, Kentucky.  In 2017, Homeland Security Investigations ("HSI") began investigating Tokyo Dragon after receiving a tip from a nurse who suspected that Zheng and Wu were trafficking an individual.  On September 9, 2021, a federal grand jury indicted Zheng and Wu on four counts of harboring illegal noncitizens for commercial gain and one count of conspiracy for the same.

The trial evidence showed that Zheng and Wu employed individuals of Chinese descent and four Hispanic men at Tokyo Dragon.  The Hispanic men were noncitizens who lived and worked in the United States illegally.  They lived in the basement of Zheng and Wu's home. Zheng and Wu transported the men to and from work every day and to the grocery store once a week.  Zheng and Wu always paid them in cash, but did not file any paperwork with the State of Kentucky or the federal government regarding their employment.  For other employees, however, Zheng and Wu paid them by check and paid their unemployment taxes.

———————————————

[1]We use the term "noncitizen" as equivalent to the statutory term "alien."  *Santos-Zacaria v. Garland*, 598 U.S. 411, 414 n.1 (2023).

One of the noncitizens, Mexican citizen Fidelino Francisco-Pedro, began working as a cook at Tokyo Dragon in February 2015. Francisco-Pedro, who generally worked six or seven days a week for eleven to twelve hours per day, testified that Zheng and Wu did not allow him to sit in the dining room where the customers would sit, relegating him and the other noncitizens to the kitchen, which was not visible from the dining room. Francisco-Pedro did not interact with customers at all, though he and the other noncitizens would sometimes fill the buffet located in the dining room. As for the noncitizens' activities at Zheng and Wu's home, Francisco-Pedro testified that Zheng instructed the noncitizens that they "should not go outside and . . . should not make any noise," R. 51, PageID 230, or else they could be deported.

On November 2, 2017, HSI executed a search warrant at Tokyo Dragon. During the search, HSI recovered federal tax forms and payroll records for some of Tokyo Dragon's employees but none for the noncitizens. Further investigation revealed that from 2014 to 2017, Tokyo Dragon filed quarterly wage reports with the Kentucky Office of Unemployment Insurance, but none of the reports listed the noncitizens. Zheng testified that neither she nor Wu reported the noncitizens' wages to the unemployment insurance office.

After a four-day trial, the jury returned guilty verdicts against Zheng and Wu on the four harboring counts and not guilty verdicts on the conspiracy count. After the court sentenced Zheng and Wu, they timely appealed their convictions.

**II.**

On appeal, Zheng and Wu challenge the district court's jury instructions about what the government needed to prove for the jury to convict them of harboring illegal noncitizens for commercial gain. Before addressing the merits of Zheng and Wu's arguments, we begin with a review of some immigration restrictions that Congress has imposed over the years, culminating with the current version of the statute at issue.

Congress first tried to limit immigration with the Alien Act of 1798, which authorized the President to expel any noncitizen he deemed dangerous. RICHARD D. STEEL, STEEL ON IMMIGRATION LAW § 1:1 (2022–2023 ed.). In 1882, Congress enacted the first significant restriction on immigration into the United States with the passage of the Chinese Exclusion Act,

22 Stat. 58, which prohibited all immigration of Chinese laborers for ten years. *See* STEEL, *supra*, at § 1:1. Nearly a decade later, the Immigration Act of 1891, 26 Stat. 1084, expanded the categories of individuals that Congress barred from immigrating to the United States. The act also imposed criminal liability on those that aided illegal immigration and vested the federal courts with jurisdiction over criminal actions arising under the act. 26 Stat. at 1084–86.

Congress then passed the Immigration Act of February 20, 1907, 34 Stat. 898. Section 8 of that law prohibited any person from unlawfully bringing noncitizens into the United States. 34 Stat. at 900–01; *United States v. Lopez*, 521 F.2d 437, 439 (2d Cir. 1975). After World War I gave rise to xenophobia in the United States, Congress responded by enacting the Immigration Act of February 5, 1917, 39 Stat. 874, which significantly revised immigration laws. *See* STEEL, *supra*, at § 1:1. The 1917 law expanded Section 8 of the Immigration Act of February 20, 1907, to prohibit harboring and concealing noncitizens in addition to barring persons from bringing noncitizens into the country. Specifically, Section 8 of the 1917 law made it a misdemeanor offense for:

> [A]ny person . . . who shall bring into or land in the United States, by vessel or otherwise, . . . or shall conceal or harbor, or attempt to conceal or harbor, or assist or abet another to conceal or harbor in any place . . . any alien not duly admitted by an immigrant inspector or not lawfully entitled to enter or to reside within the United States under the terms of this Act[.]

8 U.S.C. § 144 (repealed 1952). Section 8 authorized a sentence of up to five years' imprisonment "for each and every alien so landed or brought in or attempted to be landed or brought in." *Id.*

Section 8 came under fire after a grand jury indicted a defendant for concealing and harboring illegal noncitizens. *United States v. Evans*, 333 U.S. 483, 484 (1948). Section 8 housed two different offenses: (1) unlawfully bringing illegal noncitizens into the United States, and (2) unlawfully concealing or harboring illegal noncitizens. *Id.* But it only authorized punishment for the first offense. *Id.* The Supreme Court upheld the dismissal of the criminal charges against the defendant because Congress failed to prescribe a penalty for concealing and harboring illegal noncitizens. *Id.* at 495.

In 1952, Congress repealed the 1917 law and passed the Immigration and Nationality Act of 1952, 66 Stat. 163.  As part of that law, it became a felony offense for:

> Any person . . . who . . . willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, . . . any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this Act[.]

8 U.S.C. § 1324(a)(3) (1953).  Although the act did not define "harbor," it stated that employing a noncitizen did not constitute harboring.  *Id.*

In 1986, Congress amended 8 U.S.C. § 1324 as part of the Immigration Reform and Control Act of 1986, 100 Stat. 3359.  The primary change Congress made to the statute was to the scienter requirement necessary to violate the statute.  The statutory provision at issue now makes it a felony offense for:

> Any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place . . . for the purpose of commercial advantage or private financial gain[.]

8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(B)(i).  Congress also eliminated the employment exemption.  *See id.*

### III.

On appeal, Zheng and Wu argue that the district court erred by refusing to instruct the jury that the government must prove they intentionally harbored or concealed the noncitizens from law enforcement.  They also argue that the trial court's "harboring" instruction invaded the province of the jury by providing examples of conduct—housing and employment—which they allege made up "the entirety of the government's case."  We address each argument in turn.

**A.**

**1.**

We first consider whether the district court properly instructed the jury about "harboring." Zheng and Wu proposed that the district court instruct the jury that "'harboring' encompasses conduct *with the intent to* substantially facilitate an alien remaining in the United States illegally and to prevent government authorities from detecting his or her unlawful presence." R. 40, PageID 138–39 (emphasis added). The district court disagreed and instructed the jury that "'harboring' encompasses conduct that tended to substantially facilitate an alien remaining in the United States illegally and to prevent government authorities from detecting his or her unlawful presence." R. 56, PageID 333.

We review the legal accuracy of jury instructions de novo. *United States v. You*, 74 F.4th 378, 391 (6th Cir. 2023). We review the district court's refusal to give a proposed instruction for an abuse of discretion. *United States v. Skouteris*, 51 F.4th 658, 670 (6th Cir. 2022) (citing *United States v. Hills*, 27 F.4th 1155, 1188 (6th Cir. 2022)). An abuse of discretion "occurs when (1) the denied instruction correctly states the law; (2) the actual instruction did not substantially cover the denied instruction; and (3) the refusal to give the denied instruction substantially impaired the defense." *Id.* (citing *United States v. Henderson*, 2 F.4th 593, 597 (6th Cir. 2021)); *see Hills*, 27 F.4th at 1189.

Zheng and Wu have failed to show that the district court incorrectly instructed the jury about "harboring." Ultimately, this is a question about the scienter requirement necessary to prove "harboring." The prior version of the statute—found in the Immigration and Nationality Act of 1952—required the government to prove that a defendant "willfully or knowingly" harbored or attempted to harbor an illegal noncitizen from detection. 8 U.S.C. § 1324(a)(3) (1953). But under the current statute, Congress attached a "knowing or in reckless disregard" mens rea to the "fact that an alien has come to, entered, or remains" unlawfully in the United States. 8 U.S.C. § 1324(a)(1)(A)(iii). Thus, in passing the Immigration Reform and Control Act of 1986, Congress removed the statutory requirement that a person willfully or knowingly conceal, harbor, or shield a noncitizen from detection. *Compare* 66 Stat. at 228–29, *with* 100

Stat. at 3382. The district court's instruction better comports with § 1324(a)(1)(A)(iii) than Zheng and Wu's requested instruction. Their requested instruction would have added a specific intent requirement that is not evident in the statute. And even though the statute does not define "harbor," the statute's history indicates that Congress does not require the government to prove that a defendant acted intentionally, as Zheng and Wu argue.

The reenactment canon of statutory interpretation also counsels against reading a specific intent requirement into "harbor." That canon "provides that whenever Congress amends a statutory provision, 'a significant change in language is presumed to entail a change in meaning.'" *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020) (quoting *Arangure v. Whitaker*, 911 F.3d 333, 341 (6th Cir. 2018)). Congress's amendment of § 1324 from criminalizing persons that willfully or knowingly harbored illegal noncitizens to criminalizing persons that knowingly or recklessly disregard the fact that a noncitizen remains in the country illegally and harbors the noncitizen is a significant change to the statute. Thus, we must presume that the amended version has a different meaning than the original.

Keep in mind that Congress did not define "harbor" when it enacted the Immigration Reform and Control Act of 1986. Although we have opined that "dictionaries are a good place to start" when a statute does not define a term, *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013), we agree with Judge Posner's observation in *United States v. Costello* that "dictionaries must be used as sources of statutory meaning only with great caution," 666 F.3d 1040, 1043 (7th Cir. 2012). Indeed, "the choice among meanings must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures." *United States v. Hill*, 963 F.3d 528, 533 (6th Cir. 2020) (quoting Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 67 (1994)); *Costello*, 666 F.3d at 1043. And context plays a crucial role, particularly when a common word has several meanings. *See Hill*, 963 F.3d at 533.

Such caution is particularly appropriate where, as here, dictionary definitions do not shed much light on the mens rea required to "harbor" an illegal noncitizen. *See, e.g.*, *Harbor*, OXFORD ENGLISH DICTIONARY (rev. ed. 1933) ("To provide a lodging or lodging place for; to shelter from the weather or the night; to lodge, entertain; . . . [t]o give shelter to, to shelter.");

*Harbor*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1986) ("To give shelter or refuge to; take in"); *Harboring*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("The act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien."); *see also Harboring an Illegal Alien*, BLACK'S LAW DICTIONARY (8th ed. 2004) ("The act of providing concealment from detection by law-enforcement authorities or shelter, employment, or transportation to help a noncitizen remain in the United States unlawfully, while knowing about or recklessly disregarding the noncitizen's illegal immigration status."). *But see Harbor*, BLACK'S LAW DICTIONARY (4th ed. 1951) ("To afford lodging to, to shelter, or to give a refuge to. To clandestinely shelter, succor, and protect improperly admitted aliens." (citing *Susnjar v. United States*, 27 F.2d 223, 224 (6th Cir. 1928))); *Harbor*, BLACK'S LAW DICTIONARY (5th ed. 1979) (same). We must be careful in relying on such broad definitions to criminalize conduct that may not constitute "harboring" under § 1324.

Our sister circuits take different approaches to describing "harboring." The Third, Fifth, and Eighth Circuits agree with the district court's instruction that "harboring" encompasses conduct that tends to substantially facilitate noncitizens remaining in the country illegally and prevent authorities from detecting the noncitizens' presence. *United States v. Ozcelik*, 527 F.3d 88, 100 (3d Cir. 2008); *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007). The Second, Seventh, and Ninth Circuits have opined that "harboring" requires a defendant to act intentionally or purposefully. *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015) (requiring intent "when the basis for the defendant's conviction under § 1324(a)(1)(A)(iii) is providing housing" to an illegal noncitizen); *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("To 'harbor' under § 1324, a defendant must engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States . . . and also is intended to help prevent the detection of the alien by the authorities."); *United States v. You*, 382 F.3d 958, 966 (9th Cir. 2004); *see also Costello*, 666 F.3d at 1047 (harboring means to "materially . . . assist an alien to remain illegally in the United States without publicly advertising his presence but without needing or bothering to conceal it"). And the Eleventh Circuit requires a knowing mens rea. *United States v. Dominguez*, 661 F.3d 1051, 1063 (11th Cir. 2011). We join with the approach used by the Third, Fifth, and Eighth Circuits.

Zheng and Wu disagree with our conclusion and argue that we are bound by the way we defined "harbor" in *Susnjar*. There, we held that "[w]hen taken in connection with the purposes of the [Immigration Act of February 5, 1917], we conceive the natural meaning of the word 'harbor' to be to clandestinely shelter, succor, and protect improperly admitted aliens." 27 F.2d at 224. Zheng and Wu's reliance on *Susnjar* is misplaced for two reasons.

First, *Susnjar* self-limits its interpretation of "harbor" to the way Congress used that term in the Immigration Act of February 5, 1917. *Susnjar*'s definition of "harbor" comported with *that* statute's purpose of preventing the smuggling of noncitizens. *See id.*; *Evans*, 333 U.S. at 488 ("[T]here is some evidence in the legislative history that the addition of concealing or harboring was meant to be limited to those acts only when closely connected with . . . the smuggling process[.]"). Congress repealed that law in 1952 and replaced it with a statute that included an express mens rea for "harbor." Congress then amended the statute again in 1986 to remove the mens rea requirement for "harbor." Of course, *Susnjar* did not, and could not, construe "harbor" as Congress used that term in the Immigration and Nationality Act of 1952 or the Immigration Reform and Control Act of 1986.

Second, even if we were bound by *Susnjar*, that would not help Zheng and Wu because they did not rely on *Susnjar*'s definition of "harbor" in their proposed instruction.

Zheng and Wu also argue that their instruction is a correct statement of the law because it is consistent with a decision from the Eastern District of Kentucky. That court stated that "any jury instructions in this case must define the term 'harbor' in a manner consistent with *Susnjar* and should not state that [the] government does not have to prove that the Defendant[s] harbored the alien with the intent to assist the alien's attempt to evade or avoid detection by law enforcement." *United States v. Belevin-Ramales*, 458 F. Supp. 2d 409, 411 (E.D. Ky. 2006) (internal quotation marks omitted). But we are not bound by the decisions of a district court. *See Portsmouth Ambulance, Inc. v. United States*, 756 F.3d 494, 502 (6th Cir. 2014).

We likewise reject Zheng and Wu's arguments that the prior-construction, acquiescence, old-soil, and presumption-against-implied-repeal canons of statutory interpretation require us to follow *Susnjar*'s definition of "harbor." Under the prior-construction canon, "if courts have

settled the meaning of an existing provision, the enactment of a new provision that mirrors the existing statutory text indicates, as a general matter, that the new provision has that same meaning." *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95–96 (2017). Similarly, the acquiescence canon applies when courts have given a statute "an authoritative interpretation, and Congress reenacts it without change." *In re North*, 50 F.3d 42, 45 (D.C. Cir. 1995). Here, the 1986 law does not mirror the 1917 law. And because Congress has changed the statute multiple times since *Susnjar*, neither canon applies. We use the old-soil canon when construing terms of art that Congress has borrowed from other legal sources. *George v. McDonough*, 142 S. Ct. 1953, 1963 (2022). "Harbor" is no such term of art. Finally, the presumption-against-implied-repeal canon does not apply because, in 1952, Congress *expressly* repealed the Immigration Act of February 5, 1917. *Cf. Branch v. Smith*, 538 U.S. 254, 285 (2003) (Stevens, J., concurring in part and in the judgment) ("When Congress clearly expresses its intent to repeal or to pre-empt, we must respect that expression.").

At oral argument, Zheng and Wu argued that the presumption in favor of scienter also supports their proposed "harboring" instruction. As an interpretive maxim, the presumption in favor of scienter requires courts to read the mens rea into a criminal statute that "is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 269 (2000) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). "[T]he presumption applies with equal or greater force when Congress includes a general scienter provision in the statute itself." *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). But "there are instances in which context may well rebut that presumption." *Flores-Figueroa v. United States*, 556 U.S. 646, 660 (2009) (Alito, J., concurring in part and in the judgment). For two reasons, the presumption in favor of scienter does not help Zheng and Wu.

First, to the extent the presumption in favor of scienter applies, the mens rea for harboring would be "knowing or conscious disregard" because that is the general scienter in the subject statute. *See* 8 U.S.C. § 1324(a)(1)(A)(iii). But Zheng and Wu's proposed instruction sought to impose a specific intent mens rea—a scienter requirement higher than knowing or conscious disregard. Zheng and Wu have provided no jurisprudential support for the proposition

that the presumption in favor of scienter can impose a heightened mens rea from that which the statute specifies.

And second, the statutory history rebuts the presumption in favor of scienter. As mentioned above, the prior version of the subject statute required the government to prove that a defendant "willfully or knowingly" harbored an illegal noncitizen from detection. 8 U.S.C. § 1324(a)(3) (1953). Congress then removed that mens rea requirement from the statute when it amended the statute in 1986. *See* 8 U.S.C. § 1324(a)(1)(A)(iii). The Supreme Court has assumed that statutory history can rebut the presumption in favor of scienter. *See Rehaif*, 139 S. Ct. at 2199.

In sum, the district court did not err in instructing the jury and refusing to give Zheng and Wu's requested instruction. But even if it did, the error was harmless for the reasons below.

**2.**

A district court erroneously instructing a jury about the elements of an offense is an error subject to harmless-error review under the standard announced in *Chapman v. California*, 386 U.S. 18 (1967). *Rose v. Clark*, 478 U.S. 570, 579–80 (1986). Under the *Chapman* standard, an error is harmless when "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman*, 386 U.S. at 24). The Supreme Court has "held that '*Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless.'" *Clark*, 478 U.S. at 583 (quoting *United States v. Hasting*, 461 U.S. 499, 509 n.7 (1983)).

The jury would have found Zheng and Wu guilty even under their proposed instruction. The government presented overwhelming evidence that Zheng and Wu harbored illegal noncitizens and intended to assist them in avoiding detection by law enforcement. The noncitizens lived in the basement of Zheng and Wu's home and were instructed that they "should not go outside and . . . should not make any noise," or else they could be deported. Zheng and Wu transported the noncitizens to and from the restaurant every day, minimizing their need to interact with the public. *Cf. Tipton*, 518 F.3d at 595 (finding that defendants harbored

noncitizens by providing them with transportation to and from work, among other things). At work, the noncitizens were relegated to the kitchen, which was not visible from the dining room, and were not allowed to interact with the customers.  Additionally, Zheng and Wu paid the noncitizens only in cash while they paid other employees by check.  And although Zheng and Wu paid unemployment taxes for some of their employees, they did not file any paperwork with the State of Kentucky or the federal government regarding the noncitizens.  *Cf. McClellan*, 794 F.3d at 747, 751 (finding that there was sufficient evidence that the defendant intentionally harbored illegal noncitizens because the defendant placed the noncitizens in a home (rent-free) that minimized their exposure to the general public, paid part of their wages in cash, and did not report those wages to the state); *Tipton*, 518 F.3d at 595.  Based on this evidence, a reasonable jury would find that Zheng and Wu intended to harbor and conceal the noncitizens from detection by law enforcement.

Zheng and Wu's arguments to the contrary fail.  They argue that a reasonable jury could not find them guilty because the noncitizens were in public view.  Even so, their actions— providing the noncitizens with employment, housing, and transportation; preventing the noncitizens from interacting with customers; paying the noncitizens only in cash; and failing to file paperwork with the state and federal governments—impeded the government's ability to locate the noncitizens.  *See United States v. George*, 779 F.3d 113, 121 (2d Cir. 2015) ("[W]here a defendant's conduct 'undoubtedly diminished the government's ability to locate' an illegal alien, he was guilty of harboring even if he 'did not actively hide [the alien] from the outside world.'" (second alteration in original) (quoting *Vargas-Cordon*, 733 F.3d at 382)).  Thus, a reasonable jury would have found Zheng and Wu guilty, and any error in not providing Zheng and Wu's proposed jury instruction was harmless.

Zheng and Wu also argue that any error in instructing the jury about "harboring" could not have been harmless because: (1) they introduced evidence contesting that element, and (2) the evidence against them was not overwhelming.  But we must consider the record as a whole to determine whether any instructional error was harmless beyond a reasonable doubt.  *See Clark*, 478 U.S. at 583.  Having conducted that examination, we "conclude beyond a reasonable doubt that the jury verdict would have been the same absent" the alleged instructional error in this case.

*See Neder*, 527 U.S. at 19. And the denial of an intent to engage in wrongdoing "does not dispose of the harmless-error question." *Clark*, 478 U.S. at 583–84.

**B.**

Next, we consider whether the district court's instructions invaded the province of the jury. The Sixth Amendment guarantees defendants "the opportunity for a jury to decide guilt or innocence." *United States v. Mentz*, 840 F.2d 315, 319 (6th Cir. 1988) (citation omitted). The judge and jury have "well-defined roles" in a criminal trial: "[t]he trial judge instructs the jury on the law applicable to the issues raised . . . . The jury then independently determines the facts, and applies the law to those facts, in reaching its fateful decision." *Id.* (citations omitted). The judge "invades the jury's province when, instead of simply instructing on the law, he applies the law to facts he has determined." *Id.* at 319–20 (citation omitted).

We review the district court's choice of jury instructions for an abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). The district court "has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge 'fails accurately to reflect the law.'" *Id.* (quoting *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999)).

The following part of the "harboring" instruction is at issue: "Such facilitation may be attempted through a wide range of conduct, including, but not limited to, providing housing and employment."**[2]** R. 105, PageID 1518; R. 56, PageID 333. Zheng and Wu contend that by providing examples that were prominent in their case, the district court applied the law to the facts of the case, thus depriving the jury of the opportunity to do the same. We disagree.

We must read the instruction in its entirety. *See Mentz*, 840 F.2d at 320. When we do so, the district court did not unequivocally state that Zheng and Wu substantially facilitated the noncitizens remaining in the United States by providing housing and employment. The court's instruction specified that providing housing and employment are ways to show substantial

---

**[2]**Zheng and Wu proposed this exact statement in their proposed jury instructions prior to trial. During a conference with the court, however, they objected to their own instruction. The district court overruled the objection because "providing housing and employment can, in fact, facilitate a harbor." R. 95, PageID 1091.

facilitation. The jury still had to determine: (1) whether Zheng and Wu provided housing and employment to noncitizens; (2) if so, whether such conduct "tended to substantially facilitate an alien remaining in the United States illegally"; and (3) whether such conduct "tended . . . to prevent government authorities from detecting [the noncitizens'] unlawful presence." R. 105, PageID 1518. The district court therefore "did not decide facts for the jury but merely stated the law[.]" *See United States v. Dedman*, 527 F.3d 577, 601 (6th Cir. 2008). The instruction did not "reliev[e] the government of its burden of proving, beyond the *jury's* reasonable doubt, that [Zheng and Wu] committed the crimes charged." *Mentz*, 840 F.2d at 320.

Moreover, the district court adequately explained the jury's role as factfinder by instructing the jurors that "[d]eciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way." R. 105, PageID 1502. As a result, we find that the district court did not invade the province of the jury.

*Mentz*, the only case Zheng and Wu cite to support their argument, is inapposite. In *Mentz*, the government had to prove that deposits stolen from financial institutions were insured by the FDIC at the time of a robbery, and the court's instruction stated that the subject financial institutions were "bank[s] whose deposits were insured by the [FDIC] at the time of the offenses alleged in the indictment." 840 F.2d at 318–19. There, we held that "the trial judge invaded the jury's province by instructing that body, in clear and unequivocal language, that the banks were FDIC insured at the time the robberies occurred." *Id.* at 320. We also concluded that the district court never "instructed the jury that the government was required to prove beyond a reasonable doubt that the banks were FDIC insured" when the crimes occurred. *Id.* at 321. Here, the opposite is true. The court left it to the jury to decide whether Zheng and Wu had broken the law.

**IV.**

For these reasons, we **AFFIRM** the district court's judgment.

————————————

**CONCURRENCE**

————————————

KETHLEDGE, Circuit Judge, concurring in part and concurring in the judgment. I join all of the majority's opinion, with one exception. Specifically, I do not join the majority's statement that—to prove the offense of harboring illegal noncitizens for commercial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(A)(v)(II)—the government need not prove that the defendant "knowingly" harbored illegal noncitizens. Maj. Op. at 8. The question whether the government must prove such knowledge is not presented here: Zheng and Wu make no argument to that effect (instead their proposed instruction would have required the government to prove that they did so intentionally). The majority's conclusion that the government need not prove such knowledge is therefore dictum. I also think that conclusion is likely mistaken. *See, e.g., Elonis v. United States*, 575 U.S. 723, 734 (2015).